John BATTLE, an individual d/b/a Battle Produce Exchange, Plaintiff,

v.

FRESH PREPS DISTRIBUTION, INC., National Bank of Detroit, Inc., and Dominic Cusumano, Defendants.

No. 94–CV–74588–DT.

United States District Court, E.D. Michigan, Southern Division.

Jan. 24, 1995.

Andrew P. Abood, Abood, Abood & Rheaume, Lansing, MI, for plaintiff.

Cynthia M. Martinovich Lardner, Warren, MI, for defendants.

### OPINION AND ORDER GRANTING DEFENDANT NBD'S MOTION FOR INTERPLEADER, DISPOSITION OF TRUST ASSETS, AND PRELIMINARY INJUNCTION

AT A SESSION of said Court, held in the United States Courthouse, in the City of Detroit, State of Michigan, on the 24th day of January, 1995.

ZATKOFF, District Judge.

### I. INTRODUCTION

This matter is before the Court on defendant National Bank of Detroit, Inc.'s Motion for Ruling on Interpleader. Plaintiff filed a response, to which defendant has replied.

The Court finds that the facts and the legal arguments are adequately presented in the briefs, and that the decisional process would not be significantly aided by oral arguments. Accordingly, the motion before this Court will be disposed of upon the briefs submitted by the parties. *See* E.D.Mich. Local R. 7.1(e)(2). For the reasons set forth below, defendant/counter-plaintiff's motion is GRANTED.

### II. BACKGROUND

Plaintiff John Battle is an individual doing business as Battle Produce Exchange (hereinafter collectively referred to as "Battle"). Defendants Fresh Preps Distribution, Inc. and Fresh Preps, Inc. (hereinafter "FP") are wholly owned by defendant Dominic Cusumano. The parties are engaged in the business of produce distribution, and therefore fall under the regulation of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.*

National Bank of Detroit, N.A. ("NBD") had a lending relationship with FP dating back to 1992. The loans included equipment leases and business loans, and were secured by Cusumano and another individual. The most recent Credit Agreement was dated

July 31, 1993, and provided that FP· would "... pay its debts and obligations under normal terms." NBD Ex 1. FP also maintained an account into which its accounts receivable were deposited.

In September, 1993, the contract was verbally modified to require FP to make "pay downs" of 3% of their collected accounts receivable to NBD on the loan amounts then outstanding. FP was free to use the remainder to, among other things, pay suppliers and distributors. The amount of set off was increased to 5% in November, 1993, at which time NBD states it was owed $292,339.00.

In October, 1993, it came to NBD's attention that FP was in default of several financial covenants, as well as reporting and servicing requirements. During a series of meetings which followed, NBD learned that FP had lost its largest customer, which had constituted 60–70% of·FP's accounts receivable. It also came to light that FP had received at least two PACA notices, indicating that two produce suppliers had not been paid. FP was unable or unwilling to articulate the potential number of additional PACA claimants. NBD repeatedly requested information concerning accounts receivable and accounts payable.

On February 18, 1994, NBD and FP entered into a Voluntary Liquidation Agreement. The agreement establishes a budget for FP, and, provides in part, that all PACA claimants are to be paid by FP. NBD Ex. 4. A list of PACA claimants was to be provided to NBD by March 15, 1994, at which time NBD would be able to determine the amount owed by FP to various produce suppliers, and the amount NBD could expect to receive as a set-off against amounts owed. No such list was provided, and NBD took no set-off.

On or about April 8, 1994, NBD received a letter from the United States Department of Agriculture ("USDA") requesting that FP's accounts receivable or trust proceeds be frozen in a separate interest-bearing account. NBD complied, and transferred FP's remaining account balance, $40,683.00, to a new account. NBD Ex. 9 and Godzak Aff. NBD was subsequently notified by the USDA that there were some $170,000 in PACA claims against the new account. NBD logically concluded that it would receive no set-off from the account, and the account has remained frozen since.

On October 3, 1994, plaintiff Battle, an unpaid creditor of FP, filed suit against FP, Cusumano and NBD, alleging that he is a PACA claimant, and that NBD has failed to account for trust proceeds. Battle seeks a reparation award against FP and Cusumano. Battle also claims that NBD received payments in violation of the trust, and should be held accountable. Battle Resp. at 5.

In response, NBD has filed the instant motion for interpleader, seeking to turn over the frozen account proceeds to the Clerk of the Court, to be dismissed from the action, and to allow the PACA claimants and the Court to determine the distribution of the trust. NBD also seeks attorney's fees, payable from the trust, and an injunction requiring other claimants to join the instant action rather than filing other actions against NBD relating to this matter.

## III. OPINION

### A. PACA

Under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. § 499a *et seq.,* commission merchants, dealers, and brokers who receive produce from suppliers hold the produce, or proceeds from the retail sale, in trust for their unpaid suppliers. 7 U.S.C. § 499e(c)(2). The competitive nature of the industry, the perishable nature of the product, the number of merchants and the inability to perform extensive credit checks require such protections. The most recent authority outlines PACA as follows:

> PACA was enacted in 1930 to promote fair trading practices in the marketing of perishable agricultural commodities, largely fruits and vegetables. The statute was amended in 1984 to create a statutory trust for the benefit of unpaid produce suppliers.

> Under the trust provision, commission merchants, dealers, and brokers who receive perishable agricultural commodities hold them in trust for produce suppliers

until the suppliers are fully paid. The trust is a floating, non-segregated, statutory trust which extends not only to commodities, but also to inventories of food or other products derived from the commodities and receivables or proceeds from the sale of the commodities or products. 7 U.S.C. § 499e(c)(2).

An unpaid produce supplier or seller must give written notice of its intent to preserve trust benefits to the produce dealer, broker, or commission merchant within thirty (30) days after payment is due. The notice of intent must also be filed with the Secretary of Agriculture. Id. at § 499e(c)(3).

The statute vests the United States district courts with jurisdiction over actions by trust beneficiaries to enforce payment from the trust and actions by the Secretary of Agriculture to prevent dissipation of the trust. Id. at § 499e(c)(4).

*Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374 (3d Cir.1994).

The instant case involves amounts owed by defendant FP to Battle and other claimants, pursuant to the statute. The plaintiff has proceeded against NBD because it holds, and received pay downs from, the account into which FP deposited its accounts receivable—the proceeds from sales of produce held in trust.

## B. Interpleader/Relief Sought

■ Interpleader actions are governed by Fed.R.Civ.P. 22, and statutorily by 28 U.S.C. §§ 1335, 1397, and 2361. Rule 22 states:

(1) Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that the plaintiff is not liable in whole or in part to any or all of the claimants. *A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim....*

*Id.*, (emphasis added). Defendant has filed the necessary counterclaim for interpleader in the instant action. Pursuant to § 1335, NBD seeks to deposit the proceeds from the account in question with the Clerk of the Court. Section 1335 states, in pertinent part:

(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association or society having in his or its custody or possession money or property of the value of $500 or more ... if

(1) Two or more claimants, of diverse citizenship ... are claiming or may claim to be entitled to such money or property ...; and if

(2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court ...

*Id.* Accordingly, the express language of the statute provides for the party to an interpleader action who is in possession of the amount in question to pay the money to the Clerk of the Court.

■ In addition, NBD seeks, pursuant to 28 U.S.C. § 2361, to have the Court enter an Order restraining additional potential claimants from filing additional actions. Section 2361 states, in pertinent part:

In any civil action of interpleader or in the nature of interpleader under section 1335 of this title, a district court may issue its process for all claimants and enter its order restraining them from instituting or prosecuting any proceedings in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court....

*Id.* Again, pursuant to the express language of the statute, NBD is entitled to request the injunction in the instant matter.

## C. Analysis

NBD's entitlement to the relief sought depends on its strict adherence to PACA guidelines, and the absence of any breach by NBD of the statutorily created trust.

Plaintiff Battle does not point to any transaction that is improper—that is, that is not in accordance with the lending relationship set up between NBD and FP. A review of the pleadings in this matter, including the extensive financial records of FP which have been submitted, also fails to reveal any transaction not provided for in the various agreements that set out the lending relationship.

■ Rather than contest the credit agreements, plaintiff contends that NBD was on notice of the existence of PACA claimants at the time it accepted some of the 3% and 5% pay downs from FP's accounts receivable. If NBD had such notice, it cannot assert the "bona fide purchaser" defense, and acceptance of the pay downs may be a breach of the trust, requiring NBD to disgorge such payments in favor of PACA claimants. The issues before the Court are then, (1) what notice is required under PACA; and (2) what notice did NBD receive, and when?

### 1. Bona Fide Purchaser

■ Battle, in opposing NBD's motion, contends that NBD received and accepted payments of approximately $40,000 in five payments from FP after the time it knew or should have known that FP was in violation of the statutory PACA trust in favor of Battle and other claimants.

In fact, NBD did receive payments from November, 1993, until February, 1994, while FP was in breach of the PACA trust. The question which remains is whether NBD had notice of FP's trust violation. In *Consumers Produce, Inc. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374 (3d. Cir.1994), the court adopted the approach taken in *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311 (11th Cir.1992), which held that secured lenders are entitled to present a "bona fide purchaser" defense under the PACA statute using traditional trust law principles. 952 F.2d 1311 (11th Cir.1992).[1] The "bona fide purchaser" defense is defined by the *Restatement (Second) of Trusts* as follows:

> (1) If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of the trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.
>
> (2) In the *Restatement* of this Subject, such a transferee is called a "bona fide purchaser."

§ 284 (1959).

In the instant matter, Battle has only challenged the notice element of the definition. If NBD did not have notice, it is entitled to the bona fide purchaser defense, and need not disgorge the payments collected.

### 2. Notice of Breach of Trust

■ The *Consumers Produce* court conclusively held that PACA provides secured lenders, such as NBD, with notice of the statutory trust, not with notice of the *breach* of that trust by a PACA trustee. *Id.* at 1381 (*citing C.H. Robinson Co., supra*).[2]

**1.** *See also Sheppard v. KB Fruit & Vegetable, Inc.*, Civ.A. No. 91–6624, 1993 WL 21008 (E.D.Pa. Jan. 12, 1993); *Merrill Farms Corp. v. H.R. Hindle & Co.*, 149 B.R. 775 (Bankr.E.D.Pa.1993); *A & J Produce Corp. v. CIT Group/Factoring, Inc.*, 829 F.Supp. 651 (S.D.N.Y.1993).

**2.** The *Consumers Produce* court held: [w]e find no express language in the PACA statute which alters the application of the traditional trust standard for notice of breach of trust to third party transferees, including secured lenders. Congress could easily have imposed strict liability on secured lenders by making them trustees or guarantors of the PACA trust. However, the statute does not incorporate such language. In fact, the explanatory note to the regulations implementing the PACA trust states that:

> [t]rust assets are available for other uses by the buyer or receiver. For example, trust assets may be used to pay other creditors. It is the buyer's ... responsibility as trustee to insure that it has sufficient assets to assure prompt payment for produce and that any beneficiary under the trust will receive full payment. Explanatory Note, 49 Fed.Reg. 45738.

The *Consumers Produce* court held that:

> the appropriate legal standard for determining whether a lender with a security interest in PACA trust assets has notice that a produce purchaser is breaching the PACA trust by making loan payments in the ordinary course of business is set forth in *Restatement (Second) of Trusts* § 297(a)
>
> . . .

*Id.* at 1382. In the absence of contrary precedent by the Sixth Circuit, the Court finds the *Consumers Produce* opinion persuasive.

The *Restatement (Second) of Trusts* § 297(a) sets out a "knew or should have known" standard for the breach of a trust. Under the Restatement:

> [a] third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is *when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust*, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.

Section 297 comment a (emphasis added).

■ The *Consumers Produce* Court applied the standard:

> Thus, a duty of inquiry arises when a person knows facts which under the circumstances suggest (1) that the person is dealing with a trustee and (2) that the trustee may be committing a breach of trust. If a duty of inquiry exists, and such inquiry would have disclosed the breach of

trust, a person "should have known" of the breach of trust.

> The existence and the extent of a duty of inquiry depend on the character of the transaction and the character of the trust property. *Scott & Fratcher, supra,* § 297. *In the PACA context, a duty of inquiry arises when a third-party transferee has knowledge that a produce purchaser/trustee is not paying produce suppliers or is in financial difficulty.*[3]

*Id.* at 1383 (emphasis added).

### 3. Inquiry

■ According to *Consumers Produce,* NBD's duty of inquiry arose once NBD had knowledge that FP, a produce purchaser/trustee was not paying produce suppliers or was in financial difficulty.

■ Battle contends that NBD, by its own admission, was aware, in December, 1993, that PACA notices had been filed against FP. Moreover, Battle contends that a reasonably prudent person would have made a more diligent inquiry as early as October, 1993, and payments accepted thereafter are a violation of the trust.

NBD has thoroughly documented its "inquiry," by way of correspondence and the affidavits of Laura Godzak, the Loan Officer in charge of the FP account. NBD's inquiry began in October, 1993, when NBD, by its own admission, became aware that FP was in default on "several financial covenants." NBD requested copies of FP's financial statements, but received, pursuant to numerous requests, only (1) July accounts receivable and accounts payable statements on October 5, 1993; (2) August accounts receivable

*Id.* at 1381.

In *C.H. Robinson Co. v. Trust Co. Bank, N.A.,* 952 F.2d 1311 (11th Cir.1992), the Eleventh Circuit concluded in dicta that traditional trust protections apply to secured lenders who receive PACA trust assets in breach of a PACA trust. *Id.* at 1314–1316.

**3.** *Id.* at 1383, n. 6: A third party's knowledge that a transfer involves a PACA trustee and the transfer of trust assets is insufficient alone to create a duty of inquiry. As noted previously, the explanatory note to the regulations implementing the PACA trust states that, "[t]rust assets are available for other uses by the buyer or receiver.

For example, trust assets may be used to pay other creditors. It is the buyer's responsibility as trustee to insure that it has sufficient assets to assure prompt payment of produce and that any beneficiary under the trust will receive full payment." Explanatory Note, 49 Fed.Reg. 45738 (1984). The transfer of trust assets is legitimized by the explanatory note and third party transferees should only be put on inquiry as to a breach of the trust if they are aware of facts under the circumstances which indicate that suppliers are not being paid or that the trustee has insufficient assets to both make the transfer and pay suppliers.

statements on October 8, 1993; and (3) September accounts receivable statements on October 19, 1993. Godzak Aff at 3. NBD received no other documentation until December 31, 1993. In addition, FP attributed the defaults to an account FP had terminated in the first half of 1993 due to a slim profit margin, and NBD was informed that Cusumano had invested $200,000 into the company. Godzak Supp.Aff. at 2–3.

At a December 2, 1993, meeting, NBD was notified that FP had lost its biggest customer, and that FP had received two PACA claims. NBD again requested documentation, but was informed that there was enough money/accounts receivable to pay all PACA claimants. No information was forthcoming on the financial situation or the level of PACA claimants. Godzak Aff. at 3. NBD again requested documents at a December 15, 1993, meeting, and via a December 20, 1993, follow-up letter. NBD Ex. 2. On December 31, 1993, NBD received only the October, 1993, accounts receivable statements.

NBD accepted pay downs at a rate of 5%, until February 16, 1994. FP ceased operations in February, 1994, and the parties entered into a Voluntary Liquidation Agreement on February 18, 1994. NBD Ex. 4. According to the agreement, NBD was to receive copies of all PACA notices by February 25, 1994. NBD Ex. 4 at 10. In a March 11, 1994, letter, NBD indicated that it had not received the required information, that it was aware of three PACA claims, but it had not been made aware of the "current level of properly perfected PACA claims." NBD Ex. 5. According to the agreement, NBD was to have been informed by March 15, 1994, of the level of the claims and the amount NBD could expect as a set-off after all claims had been paid. Godzak Aff. at 5. NBD was not informed, and took no set-off. *Id.*

In a letter of April 2, 1994, the USDA asked NBD to freeze the account of FP in favor of unpaid PACA claimants. NBD Ex. 8. NBD did so. In a letter of April 4, 1994, NBD indicated that it still did not know the level of unpaid claimants. NBD Ex. 7, at 2. It appears that, despite the numerous meetings, agreements, and letters, NBD was not informed of the level of claimants until receiving a second letter from the USDA on May 27, 1994. NBD Ex. 9. The letter indicates the level of claimants is $170,758.34. *Id.* At that time NBD became aware that the claimants would deplete the frozen account and it would receive no set-off.

Under the circumstances outlined above, the Court cannot find that NBD received payments in violation of the trust. NBD's duty of inquiry arose as early as December 2, 1993. NBD had begun its inquiry prior to that time, however. The unwillingness of FP to cooperate, despite the repeated requests and signed documents does not and cannot make NBD the guarantor of the amounts owed by FP.

NBD received pay downs in the normal course of business until February 16, 1994. The liquidation agreement of February 18, 1994, indicates that FP maintained that it would be able to pay all claimants *and* have an excess to set-off amounts owed to NBD. The parties proceeded under this assumption until at least March, 1994.

■ Battle's contention that NBD should have made a "more diligent inquiry" is without merit. Battle contends that NBD should not have accepted *any* payment after the first notice in December that PACA claims had been filed. On the contrary, the Court finds that the notice merely initiated the duty of inquiry which NBD pursued diligently. Despite FP's representations that all claimants would be paid, NBD sought records and documentation as proof. Such items were not available to NBD until May, 1994, three months after NBD received its last pay down.

"The produce purchaser [FP] is the trustee of the trust and creditors [NBD] are not insurers of unpaid beneficiaries [Battle] when they receive trust assets in breach of trust." *Consumers Produce, supra,* at 1381. Accordingly, the Court cannot find that NBD's acceptance of pay downs in the normal course of business, without notice of FP's breach of the PACA trust, subjects NBD to any liability. The relief requested is therefore appropriate, and NBD's motion is GRANTED.

## IV. CONCLUSION

In light of the above analysis, this Court finds that NBD was a bona fide purchaser for value, without notice, as contemplated by *Restatement (Second) of Trusts* § 297(a) and *Consumers Produce v. Volante Wholesale Produce, supra.* Accordingly, NBD is not subject to any liability to PACA claimants beyond the amount frozen in the Fresh Prep account pursuant to the request by the USDA. Defendant NBD's motion is GRANTED.

Now, therefore, IT IS HEREBY ORDERED that:

1. NBD shall pay to the Clerk of the Court the total amount held in the Fresh Prep account, $40,683.00, plus interest, frozen pursuant to the USDA letter of April 2, 1994. The Clerk of the Court shall hold this amount in an interest-bearing account, pending further Order of this Court.

2. ALL PACA CLAIMANTS ARE RESTRAINED from instituting or prosecuting any proceedings IN ANY STATE OR FEDERAL COURT affecting the proceeds held by the Clerk of the Court. ALL PACA CLAIMANTS are Ordered to submit an answer to the Complaint for Interpleader WITHIN 30 (THIRTY) DAYS of the date of this Order.

3. NBD shall submit a list of names and addresses of the PACA claimants to the Court WITHIN 5 (FIVE) days of the date of this Order.

4. NBD is relieved of further liability, and is DISMISSED from this matter.

5. NBD shall submit an itemized report of costs and fees expended in this matter WITHIN 30 (THIRTY) DAYS of the date of this Order. NBD's request for fees and costs is taken UNDER ADVISEMENT.

IT IS SO ORDERED.