**In re UNITED FRUIT & PRODUCE CO., INC., Debtor.**

**United Fruit & Produce Co., Inc., Movant,**

**v.**

**Absolute Exterminating, et al., Respondents.**

**Wasielewski Farms, Movant,**

**v.**

**United Fruit & Produce Co., Inc., Respondent.**

**Automated Fueling, Inc., Movant,**

**v.**

**United Fruit & Produce Co., Inc., Respondent.**

**The Fresh Juice Company of New York, Inc., Movant,**

**v.**

**United Fruit & Produce Co., Inc., Respondent.**

**United States Trustee, Movant,**

**v.**

**No Respondent.**

**Bankruptcy No. 97–11852.**

**Motion Nos. 98–QLF–7, MJH–1, DIS–1.**

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 29, 1999.

Michael S. Jan Janin, Quinn, Buseck, Leemhuis, Toohey & Krot, Erie, PA, for Debtor.

*MEMORANDUM*

WARREN W. BENTZ, Bankruptcy Judge.

Before the Court is the Debtor's Motion for Final Distribution, numerous objections thereto, and other related matters. Hearing was held on February 2, 1999 (the "Hearing"). We issued a Memorandum and Order dated February 4, 1999 wherein we decided certain issues and fixed a briefing schedule. In subsequent Orders, we have required certain parties to file additional information. We now resolve all outstanding issues and fix a distribution schedule for the remaining assets.

## I. The Fresh Juice Company of New York, Inc.

The Fresh Juice Company of New York, Inc. ("Fresh Juice") timely filed proof of claim number 77 as a general unsecured claim in the amount of $9,400. Fresh Juice makes no assertion in claim number 77 that it is entitled to treatment under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499(a) et. seq. ("PACA"). For some unknown reason, Debtor listed Fresh Juice on its proposed distribution as a creditor entitled to PACA status. Fresh Juice subsequently sought to amend its claim asserting that it was a PACA creditor for the increased amount of $26,320.

The Court recognized comments of other PACA creditors at the Hearing as an objection to the claim of Fresh Juice. It was asserted that Fresh Juice is not entitled to PACA status on account of its manufacturing process which converts the fruit into food of a "different kind and character" and is therefore outside of the protection of PACA. *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1070–71 (2d Cir.1995) and *In re Long John Silver's Restaurants, Inc.*, 230 B.R. 29 (Bankr.D.Del.1999).

Fresh Juice has since acknowledged that "it is not entitled to a PACA claim because it does not transport produce in its raw state." All of the transactions between Fresh Juice and United Fruit & Produce Co., Inc. ("Debtor") occurred prior to December 9, 1997 (the "Filing Date"), the date on which Debtor filed its voluntary Petition under Chapter 11 of the Bankruptcy Code. Fresh Juice will be allowed a general unsecured claim in the amount of $26,320.

## II. Caito Brothers

Caito Brothers ("Caito") supplied perishable agricultural commodities to the Debtor postpetition and has an administrative claim of $10,758.20. Caito now concedes that it is not a PACA creditor as it has failed to comply with the notice or filing requirements of 7 U.S.C. § 499e(c).

Caito seeks payment of its administrative claim either ahead of PACA claimants or in the alternative, on a prorata basis with PACA claimants.

■ PACA trust assets are not property of the estate. *In re Kornblum & Co., Inc.*, 81 F.3d 280, 284 (2d Cir.1996) and *C.H. Robinson Co. v. B.H. Produce Co., Inc.*, 723 F.Supp. 785, 791 (N.D.Ga.1989). Accordingly, they cannot be used to satisfy claims against the estate such as administrative claims. There is no basis for affording an admittedly non-PACA claim access to funds which are reserved for qualified PACA trust claims.

Caito points to the agreed payment of Debtor's counsel and suggests that other administrative claimants should be treated in a similar fashion. Payment of Debtor's counsel out of PACA trust assets was by agreement with the PACA creditors. There was no such agreement with respect to Caito's claim.

■ Finally, Caito urges that the rights of PACA claimants do not extend to the goods which Caito shipped to the Debtor as they were not purchased with PACA trust funds. The plain language of the PACA statute rejects this position where it states the trust is imposed upon the "perishable agricultural commodities received ... in all transactions, and all inventories of food or other products." 7 U.S.C. § 499e(c)(1). The goods Caito shipped to the Debtor were impressed with the PACA trust upon arrival. Caito would have been entitled to a prorata trust interest if it had acted timely to preserve its trust rights which it admittedly failed to do.

Caito's request for payment ahead of or on a prorata basis with PACA claimants will be refused.

## III. Secured Lenders

### A. Background

The major dispute is between the PACA trust creditors who assert a trust claim under the PACA statute and the Debtor's secured lenders, which, except for First

Western Bank ("First Western"), have purchase money security interests in specific vehicles or equipment. First Western asserts a blanket security interest on substantially all of the Debtor's assets. The dispute is over whether the secured lenders or the PACA trust creditors are entitled to the proceeds from the sale of Debtor's vehicles and equipment.[1]

The Debtor operated a wholesale fresh fruit and vegetable business for many years. On February 26, 1987, Debtor obtained a license called a "PACA license" issued by the United States Department of Agriculture. From at least that date through March, 1998, when Debtor ceased operations, it served as a statutory trustee and was required to hold sufficient "PACA trust assets" in trust until all suppliers of perishable agricultural commodities were paid in full. Debtor has stated that 100% of its revenue was derived from the sale of fresh fruits and vegetables. However, it is apparent that some minor portion of its revenue was derived from the sale of products, such as those from Fresh Juice, that would not qualify as fresh fruits and vege-

tables under PACA. No party has attempted to segregate the proceeds of the sale of non-PACA trust Assets from PACA Trust Assets, so we will assume that all of Debtor's sales in the ordinary course of business were sales of PACA Trust Assets.

After Debtor ceased operation, it continued to collect its accounts receivable and holds $131,443.75 from such collections. Debtor holds a separate fund of $100,633.66 derived from the August 1, 1998 court-approved auction sale of substantially all of its tangible assets.[2] The items sold at auction included assets which served as collateral for the claims of secured lenders.[3] Claims of the secured lenders and PACA creditors were transferred to the proceeds of sale pending a later determination of the issues which are presently before the Court. The lenders listed in Footnote 3 each provided a purchase money loan enabling the Debtor to acquire the asset which constitutes the collateral. Only First Western loaned money on existing equipment, taking back a security interest in the equipment as collateral.[4]

1. There is no dispute by any lender that the PACA trust creditors are entitled to the proceeds from the Debtor's collection of accounts receivable.

2. The net proceeds of sale were $115,633.66. Debtor's counsel has applied $15,000 to its attorney fee.

3.

| Lender | Collateral | Debtor's Proposed Distribution | Auction Sale Price | Approx. Loan Balance |
|---|---|---|---|---|
| National City Bank | 1994 Ford Van | $ 6,000.00 | $ 6,500.00 | $ 2,220.45 |
| National City Bank | 1995 Ford Van | 5,600.00 | 5,600.00 | 10,110.91 |
| Associates Comml. | 1995 International | 6,016.40 | 18,000.00 | 6,918.06 |
| PNC Bank | Ford Cargo Van | 1,700.00 | 1,700.00 | 0.00 |
| Navistar Financial | 1997 International | 23,000.00 | 23,000.00 | 34,113.06 |
| Navistar Financial | 1994 International * | 12,500.00 | 12,500.00 | 11,431.30 |
| Dollar Bank Leasing | Processing Equipment | 6,000.00 | 6,000.00 | 15,600.00 |
| Iron & Glass Bank | Equipment | 1,235.00 | 1,235.00 | 7,211.00 |
| | | $62,051.40 | $74,535.00 | $87,604.78 |

*There was previously some confusion over whether Navistar had a security interest in a 1994 or 1995 International. Debtor and Navistar have now agreed that Navistar has a valid and perfected lien on a 1994 International.

Debtor proposes to distribute the balance of $38,582.36 plus $4,533.66 in accrued interest to First Western on account of its blanket security interest in all of the Debtor's assets.

4. By Order dated June 23, 1999, we requested a statement of amounts due and copies of loan documents from certain lenders. PNC Bank did not respond and counsel for Debtor now advises that PNC has been paid in full and is owed nothing.

In its Motion for Distribution, Debtor lists PACA claimants with total claims of $288,090.61.[5] Debtor also proposes in its revised order filed on February 23, 1999, to distribute $62,051.40 to secured lenders who hold a validly perfected security interest in specific items of collateral and to distribute the balance of the auction proceeds to First Western on account of its blanket security interest.[6]

Each of the lenders, with the exception of First Western, hold a purchase money security interest in specific collateral. The lenders with purchase money security interests assert that PACA claimants can only reach PACA Trust Assets; that their collateral does not fall within the definition of PACA trust assets since the collateral does not constitute agricultural commodities, nor the products or proceeds thereof; and accordingly, the lenders claim entitlement to the proceeds of sale ahead of the claims of PACA creditors. Like the purchase money lenders, First Western asserts that the PACA trust does not encompass Debtor's "equipment, machinery, vehicles, intangibles, etc."

The PACA creditors assert that (1) a PACA Trust existed when the collateral was purchased; (2) the collateral was purchased with and paid for with trust assets; and (3) the PACA trust was continually in existence after the dates on which the collateral was purchased and therefore, the machinery, equipment and vehicles and the proceeds from the sale thereof are part of the PACA trust fund to be distributed to PACA trust creditors.

In *Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374 (3d Cir.1994), the Court of Appeals for the Third Circuit reviewed the history of the PACA statute:

PACA was enacted in 1930 to promote fair trading practices in the marketing of perishable agricultural commodities, largely fruits and vegetables. The statute was amended in 1984 to create a statutory trust for the benefit of unpaid produce suppliers.

Under the trust provisions, commission merchants, dealers, and brokers who receive perishable agricultural commodities hold them in trust for produce suppliers until the suppliers are fully paid. The trust is a floating, non-segregated, statutory trust which extends not only to commodities, but also to inventories of

5. A review of the filed proofs of claim and the invoices attached thereto reveal that there is insufficient information on several of the claims to determine whether they are appropriately classified as PACA creditors. "A seller eligible for the statutory trust benefits must preserve its rights by satisfying a notice requirement by either sending notice to the buyer within 30 days of a payment default or as provided in the 1995 amendment to PACA, including a statutory statement referencing the trust on its invoices." *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 199 (3d Cir.1998). We requested information from suppliers whose claims were deficient, and have by separate Order disallowed the PACA status of certain claims.

6. Debtor's proposed distribution, even if appropriate, is incorrect in several respects. The Court does not have the exact balances due each of the secured creditors. It appears, however, that Debtor proposes to distribute the sale price of the assets to the lender, irrespective of the loan balance. For example, National City Bank holds a security interest in a 1994 Ford Van which was sold at auction for $6,000 and Debtor proposes to distribute $6,000 to National City Bank. National City Bank filed proof of claim number 41 related to its loan on the 1994 Ford Van which sets forth a claim of $2,931.29 + 7.5% interest from December 12, 1997. Debtor continued to make payments on the loan postpetition. In its recent letter, National City Bank alleges a balance of $2,220.45 on this loan as of October 31, 1999. Similarly, Debtor proposes to pay Navistar Financial $12,500, the sale price of a 1994 International, while Navistar asserts a balance of $11,431.30 as of November 9, 1999. Debtor proposes, after payment to the lenders who hold individual vehicles or specific items of equipment as collateral, to distribute the balance of the auction proceeds, or $38,582.26 to First Western on account of its blanket security interest in all of the Debtor's assets. First Western has not filed a proof of claim. Upon inquiry by the Court, First Western advises that its present balance is $23;608.85.

food or other products derived from the commodities and receivables or proceeds from the sale of the commodities or products. 7 U.S.C. § 499e(c)(2).

*Id.* at 1377–78. Continuing at 1378:

The PACA statute was amended in 1984 to create a trust for the benefit of unpaid produce suppliers. The amendment begins with a legislative finding that:

a burden on commerce in perishable-agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities ... encumber or give lenders a security interest in such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products.... This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest. 7 U.S.C. § 499e(c)(1).

To remedy this burden, Congress enacted the following trust provision:

Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transaction has been received ... *Id.* § 499e(c)(2).

The trust provision requires produce purchasers to hold sufficient PACA trust assets in trust to pay all suppliers. Read in light of the legislative finding, the trust provision also straightforwardly provides unpaid suppliers with priority over secured lenders with regard to PACA trust assets held in trust by produce purchasers. It effectively vitiates a lender's security interest in trust assets held by produce purchasers vis a vis unpaid produce suppliers. See Explanation of the Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions to Effect a Statutory Trust, 49 Fed.Reg. 45735, 45738 (1984) (hereinafter "Explanatory Note").

■ The intent of the 1984 amendments to the PACA statute was to protect shippers of perishable agricultural commodities from a practice wherein the buyer would grant other creditors a security interest in its inventory and accounts receivable and upon the buyer's bankruptcy or insolvency, the supplier of perishable agricultural commodities was left with little or no protection. *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 199 (3d Cir.1998); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir.1995); *C.H. Robinson Co. v. B.H. Produce Co., Inc.*, 723 F.Supp. 785, 791 (N.D.Ga.1989).

■ The PACA trust provision "effectively vitiates a lender's security interest in trust assets held by produce purchasers vis a vis unpaid produce suppliers." *Consumers Produce*, 16 F.3d at 1379. With respect to trust assets, PACA "grants the sellers of such commodities the right to recover against the purchasers and puts the sellers in a position superior to all other creditors." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir.1997). PACA "is remedial legislation which a court should construe broadly to effectuate its purpose." *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998). Although the PACA language imposing a trust is powerful and invasive, it imposes the trust only upon a limited and defined collateral. "[T]he corpus of the trust consists of the produce, inventories of food or other products derived from the produce and any receivables or proceeds

from their sale." *Chiquita Brands, Inc. v. MicBruce, Inc.,* 800 F.Supp. 1521, 1524 (N.D.Oh.1992). It does not include vehicles and equipment.

■ The intent of PACA is not violated by recognition of the liens of Lenders who provide purchase money financing to enable the Debtor to purchase equipment for business use and take a security interest in solely the vehicles or equipment for which they provide financing. The PACA trust creditors would have us make a much broader interpretation and trace the payments made on the vehicles and equipment so that we might find that the vehicles and equipment are PACA trust assets. We decline the invitation. PACA trust assets are available for uses other than to pay PACA suppliers. *Consumers Produce* at 1381; *Advantage Produce Marketing Co., Inc.,* 1991 WL 424983 (S.D.Ohio, May 10, 1991). Trust assets may be used to pay other creditors. *Id.* It is necessary to balance the public's interest in preserving the stability of commercial transactions with the interests of the PACA trust beneficiaries in assuring that sufficient funds are maintained in the trust. *See Consumers Produce,* 16 F.3d at 1380; *C.H. Robinson,* 952 F.2d at 1314. The security interests and payments received by the vehicle and equipment lenders were nothing more than regular loan transactions in the ordinary course of business. There is no allegation that the Lenders undertook such transactions with actual or constructive knowledge of the Debtor's breach of the PACA trust.

We conclude that the Lenders have security interests in non-PACA trust assets. *See C.H. Robinson Co.,* 723 F.Supp. at 794 (granting bank summary judgment as to proceeds paid on two car loans because the loans were not secured by any trust assets and because there was no showing that the bank was on notice that monies it received were likely derived in whole or in part from trust funds).

## B. Lender's Claims

### i. Associates Commercial Corp.

Associates Commercial Corp. ("Associates") filed proof of claim number 48 as a secured claim in the amount of $5,371.79 (plus fees and costs to be determined) based on a security agreement dated January 17, 1995 which grants Associates a purchase money security interest in a 1995 International truck. A supplemental security agreement grants Associates a security interest in a Van Body and Refrigerator Unit attached to the truck. The cash price of the truck was $40,951.18. There was no cash downpayment. Debtor received a net trade-in allowance of $8,744.80 for a 1991 GMC Chassis. The balance of $32,206.38 was financed by Associates to be repaid by the Debtor with interest over 42 months at the rate of $931.98 per month.

■ Associates has subsequently stated that with interest through April 9, 1999 and 15% attorney's fees per contract, that its balance is $6,918.06. The truck was sold at auction for $18,000. Associates is entitled to distribution of $6,918.06 plus its contract rate of interest from April 9, 1999 until the date of distribution.

### ii. National City Bank

National City Bank ("NCB") filed proofs of claim numbers 41 and 42 as secured claims. Claim 41 is in the amount of $2,931.29 (plus continuing interest from December 12, 1997 at the rate of 7.5%) based on a security agreement dated May 31, 1994 which grants NCB a purchase money security interest in a 1994 Ford Van. The amount of $2,931.29 shown on the proof of claim includes attorney's fees of $250. The cash price of the 1994 Ford Van was $22,206. There was no cash downpayment. Debtor received a net trade-in allowance of $3,641 for a 1987 GMC Van. The balance, with sales tax, of $19,710.50 was financed by NCB to be repaid by the Debtor with interest over 48 months at the rate of $478.08 per month. NCB stated in a recent letter that the

balance on this loan is $2,220.45 as of October 31, 1999. The 1994 Van was sold at auction for $6,500. NCB is entitled to distribution of $2,220.45 plus its contract rate of interest from October 31, 1999 until the date of distribution on Claim No. 41.

■ Claim number 42 is in the amount of $11,129.26 (plus continuing interest from December 12, 1997 at the rate of 9.25%) based on a security agreement dated August 28, 1995 which granted NCB a purchase money security interest in a 1995 Ford Van. The amount shown on the proof of claim includes attorney's fees of $250. The cash price of the 1995 Ford Van was $21,105. There was no cash downpayment. Debtor traded in a 1981 Jeep for which it received a gross allowance of $700. The payoff on the Jeep was $700 so that there was no net trade-in allowance. The full purchase price of the 1995 Ford Van, $21,105 was financed to be repaid by the Debtor with interest over 48 months at the rate of $534.93 per month. NCB has stated in a recent brief that the balance on the loan is approximately $10,000. The 1995 Van was sold at auction for $5,600. Since NCB is undersecured on this loan, it must bear a prorata share of the sale expense for this vehicle. The auction produced gross proceeds of $135,639.00. The related expenses were $20,005.34 or 14.75%. NCB is entitled to a distribution of $4,774 ($5,600 sale price − $826 expenses) on Claim number 42.

### iii. Navistar Financial Corp.

Navistar Financial Corp. ("Navistar") filed proof of claim number 78 as a secured claim in the amount of $39,787.65 (plus interest and attorney's fees) based on security agreements dated February 14, 1994 and December 16, 1996 which grant Navistar purchase money security interests in a 1994 International Truck and a 1997 International Truck.

The cash price for the 1994 International was $45,263.00. Debtor paid a $1,000 cash downpayment and received a net trade-in allowance of $5,000 for a 1986 GMC truck. The balance of $39,263 was financed by Navistar to be repaid by the Debtor with interest over 60 months at the rate of $824.50 per month.

Navistar states that the balance on this loan is $11,431.30 as of November 9, 1999 plus reasonable attorney's fees as provided for in its agreement, which would exceed any equity in the vehicle. The 1994 International was sold at auction for $12,500. Navistar is entitled to a distribution of $10,656.25 ($12,500 sale price—$1,843.75 expense) on its loan for the 1994 International.

The cash price for the 1997 International with sales tax was $42,996.18. There was no cash downpayment. Debtor received a net trade-in allowance of $7,000 for a 1992 GMC truck. The balance of $36,050.43 (including $54.25 in fees) was financed by Navistar to be repaid by the Debtor with interest over 60 months at the rate of $761.54 per month.

Navistar states in a recent brief that the balance on this loan is approximately $30,000. The 1997 International was sold at auction for $23,000. Navistar is entitled to a distribution of $19,607.50 ($23,000 sale price—$3,392.50 expenses).

### iv. PNC Bank

PNC has not filed a proof of claim. In Debtor's Motion for Final Distribution, it proposed to distribute the $1,700 in sale proceeds from the sale of a Ford Cargo Van to PNC on account of its security interest. By Order dated June 23, 1999, PNC was directed to provide the Court a statement of the balance due and a copy of its loan documentation. PNC did not respond and Debtor's counsel advises that there is no amount owed to PNC.

No distribution from the estate is due PNC Bank.

### v. Dollar Bank Leasing Corp.

Dollar Bank Leasing Corp. ("Dollar Bank") filed proof of claim number 75 as a secured claim in the amount of $15,620.42 (plus additional interest, late charges and reasonable attorney's fees) based on a purchase money Equipment Lease dated June 29, 1995. Debtor granted Dollar Bank a

security interest in the Food Processing Centrifuge, extra baskets, and Jib Crane with hoist which were acquired through the financing lease.

The cash price for the equipment was $35,037.00 which was financed by Dollar Bank to be repaid by the Debtor over 48 months at the rate of $959.46 per month. Upon execution of the Lease, Debtor paid two advance rental payments in the total amount of $1,918.92 and $100 for closing costs. The equipment financed through the Lease was sold at auction for $6,000. Dollar Bank is entitled to a distribution of $5,115 ($6,000 sale price—$885 expenses).

### vi. Iron and Glass Bank

Iron and Glass Bank ("I & G") filed proofs of claim numbers 38 and 40. Claim number 40 is a duplicate of claim 38. I & G asserts a secured claim in the amount of $6,067.15 (plus additional interest and attorney's fees) based on a purchase money Equipment Lease dated September 28, 1995. Debtor granted I & G a security interest in the Prep/Pack Table, Conveyor, Discharge Conveyor, and E–Z TEC III Metal Detector, which were acquired through the financing lease.

The cash price for the equipment was $24,235 which was financed by I & G to be repaid by the Debtor over 36 months at the rate of $834.50 per month. Upon executing the Lease, Debtor paid the first and last month's payments in advance in the total amount of $1,669. The equipment financed through the Lease was sold at auction for $1,235. I & G is entitled to a distribution of $1,052.84 ($1,235 sale price—$182.16 expenses).

### vii. General Electric Capital Corporation

General Electric Capital Corporation ("GECC") filed claim number 82 in which it asserts a secured claim of $900. By Order dated November 24, 1999, we directed GECC to provide documentation in support of its secured claim.

GECC provided the Court a copy of a true Lease in which GECC leased to Debtor a VT 1730 Digital Duplicator, F14215 Copier and a copier stand. The lease agreement provided that title remains with GECC and that the Debtor has a right to purchase the equipment at the end of the lease term for fair market value.

The leased equipment was sold at auction for a total sale price of $700. GECC is entitled to a distribution of $596.75 ($700 sale price—$103.25 expenses).

### viii. First Western Bank

First Western Bank ("FWB") asserts a secured claim with a balance due as of March 25, 1999 of $23,608.85. FWB's claim arises from a loan agreement executed on February 2, 1996 which provided Debtor a $25,000 line of credit. Debtor executed a Security Agreement which provided that its inventory, accounts, equipment, intangibles, fixtures and the proceeds thereof as collateral.

FWB concedes that its lien on inventory and receivables is not effective as those assets are subject to the PACA trust. FWB has no security interest in vehicles as a security interest in vehicles must be noted on the certificate of title.

The gross proceeds of the auction were $135,639 which includes $97,300 from the sale of vehicles and $38,339 from the sale of equipment. Equipment upon which Dollar Bank had a first lien was sold for $6,000 and equipment upon which I & G had a first lien sold for $1,235, leaving the sale price of equipment subject to a lien in favor of FWB as $31,104 ($38,339—$6,000—$1,235). FWB has advised that the balance due on its claim is $23,608.45 as of March 23, 1999. FWB is entitled to a distribution of $23,608.45 plus its contract rate of interest from March 23, 1999 until the date of distribution.

### IV. Administrative Claims

As previously determined, the PACA trust does not extend to Debtor's vehicles and equipment. Accordingly, the proceeds from the auction sale are distributed first to the Lenders with a security interest in those items and since the proceeds from the sale of those items are not subject to the PACA trust, any balance is available for distribution to administrative claimants.

## V. Distribution

### A. PACA Trust Creditors

PACA trust creditors are entitled to a distribution from the collection of accounts receivable in the amount of $131,443.75 less $15,000 which PACA trust claimants agreed to pay Debtor's counsel for fees incurred in connection with the collection of the receivables. Thus, $116,443.75 is available for PACA claimants.[7]

The distribution is as follows:

| Proof of Claim No. | PACA Claimant | Amount of Claim | Distribution at 36.085% |
|---|---|---|---|
| 1 | Northhampton Grower Produce Sales, Inc. | $ 1,336.25 | $ 482.19 |
| 2 | Ocean Spray Cranberries, Inc. | 2,256.00 | 814.08 |
| 7 | The Sanson Company | 4,289.00 | 1,547.69 |
| 12 | Ohio Valley Mushroom Farm | 15,528.50 | 5,603.46 |
| 14 | Southern Valley Fruit and Vegetables | 985.00 | 355.44 |
| 43 | Gem Produce Network, Inc. | 31,819.15 | 11,481.94 |
| 46 | Brigiotas Farmland Produce | 17,118.65 | 6,177.26 |
| 49 | C.H. Robinson Co. | 71,993.33 | 25,979.38 |
| 51 | Andrew Smith Co. | 27,769.95 | 10,020.79 |
| 56 | Forest City Weingarg Produce | 8,795.75 | 3,173.95 |
| 58 | Joseph A. Cimino Food Brokers, Inc. | 1,704.00 | 614.89 |
| 64 | Sun Spiced, Inc. | 17,471.15 | 6,304.46 |
| 65 | Economy Produce & Vegetable Co. | 41,911.50 | 15,123.77 |
| 79 | Cavalier Gulling Wilson Co. | 7,984.00 | 2,881.03 |
| 86 | Exeter Produce & Storage Co. | 22,242.45 | 8,026.19 |
| Court Ordered | Weiss Buy Services, Inc. | 38,982.18 | 14,066.72 |
| Court Ordered | Gulfstream Tomato Packers | 8,155.75 | 2,943.00 |
| Court Ordered | Wasielewski Farms | 2,348.65 | 847.51 |
| | | $322,691.26 | $116,443.75 |

From the net auction secured claims proceeds of $115,633.66[8], we have determined that secured lenders are entitled to the following amounts:

| | | |
|---|---|---|
| Associates | $6,918.06 | (plus interest from 4/9/99) |
| National City | 2,220.45 | (plus interest from 10/31/99) |
| National City | 4,774.00 | |
| Navistar | 10,656.25 | |
| Navistar | 19,607.50 | |
| Dollar Bank | 5,115.00 | |
| I & G | 1,052.84 | |
| GECC | 596.75 | |
| First Western | 23,608.45 | (plus interest from 3/23/99) |
| Total | $74,549.30 | (plus interest as stated above) |

This leaves a balance of approximately $41,084.36 available for distribution to administrative claimants.

7. Plus a prorata share of any interest which may have been earned on these funds.

8. The balance held by Debtor has been reduced by $15,000 for counsel fees which the PACA creditors agreed could be paid from

### B. Administrative Claims

We have reviewed all of the filed proofs of claim and determined that certain claimants provided goods and services after the filing date of December 9, 1997 and are entitled to administrative status for that portion of their claim even if the claim was filed as an unsecured claim. Additionally, PACA creditors who supplied goods postpetition are entitled to an administrative claim for the postpetition portion of their claim which remains unpaid after a 36.085% distribution of the PACA trust funds:

| Proof of Claim No. | Claimant | Administrative Claim | Distribution @ 40.6413% |
|---|---|---|---|
| 4 | Deas Spring Service, Inc. (Invoice dated 12/10/97) | $ 208.54 | $ 84.75 |
| 5 | Erie General Tire (Invoice dated 12/10/97) | 257.91 | 104.82 |
| 7 | The Sanson Company (Postpetition portion of goods of $4,289.00 not paid by PACA distribution) | 2,741.31 | 1,114.10 |
| 11 | Volpe Son Kemelhar, Inc. | 1,291.50 | 524.88 |
| 12 | Ohio Valley Mushroom Farm (Postpetition portion of goods of $716 .00 not paid by PACA distribution) | 457.63 | 185.99 |
| 16 | Gohrs Printing Service (Invoice dated 12/17/97) | 147.34 | 59.88 |
| 21 | Greenfield Basket Company (Invoice dated 12/17/97) | 84.50 | 34.34 |
| 22 | Cade Electric Co. (Invoice dated 12/16/97 & 1/15/98) | 2,339.89 | 950.96 |
| 24 | James B. Schwab Co. Inc. (Invoice dated 12/18/97) | 79.50 | 32.31 |
| 37 | Menasha Corp. (Invoice dated 12/10/97) | 2,395.00 | 973.36 |
| 43 | Gem Produce Network, Inc. (Postpetition portion of goods of $31,819.15 not paid by PACA distribution) | 20,337.21 | 8,265.31 |
| 45 | Five Star Trucking, Inc. (Postpetition services) | 14,250.00 | 5,791.39 |
| 46 | Bigiotas Farmland Produce (Postpetition portion of goods of $10,160.60 not paid by PACA distribution) | 6,494.15 | 2,639.31 |

funds subject to the PACA trust for services rendered in connection with the liquidation and collection of PACA monies. The Debtor has incorrectly deducted this amount from the auction proceeds.

| Proof of Claim No. | Claimant | Administrative Claim | Distribution @ 40.6413% |
|---|---|---|---|
| 47 | Sofco Mead II (postpetition invoices) | 166.60 | 67.71 |
| 50 | Paolo Volpe & Sons, Inc. | 5,025.25 | 2,042.33 |
| 51 | Andrew Smith Co. (postpetition portion of foods of $11,172.73 not paid by PACA distribution) | 7,141.05 | 2,902.22 |
| 54 | Alloway Electric, Inc. | 1,204.00 | 489.32 |
| 55 | Urraro Oil Co. | 141.94 | 57.69 |
| 56 | Forest City Weingarg Produce (postpetition portion of goods of $4,571.50 not paid by PACA distribution) | 2,921.87 | 1,187.49 |
| 58 | Joseph A. Cimino Food Brokers, Inc. (postpetition portion of goods of $1,704.00 not paid by PACA distribution) | 1,089.11 | 442.63 |
| 59 | Four K Truck Brokers, Inc. | 432.00 | 175.57 |
| 69 | McCreary Roofing Co. Inc. | 700.00 | 284.49 |
| 70 | Bob Ferrando Ford | 785.65 | 319.30 |
| 72 | Erie Import & Domestic Auto Parts (Invoices after 12/9/97) | 376.11 | 152.36 |
| 73 | National Fuel Gas Distribution Corp. | 5,317.95 | 2,161.28 |
| 74 | Lease Corporation of America | 777.84 | 316.12 |
| 79 | Cavalier Gulling Wilson Co. (postpetition portion of goods of $7,984.00 not paid by PACA distribution) | 5,102.97 | 2,073.90 |
| 80 | George H. Althof, Inc. | 4,065.18 | 1,652.14 |
| 85 | Office of the United States Trustee (increased by $1,000 for four additional quarters) | 4,000.00 | 1,625.65 |
| Court Ordered | Caito Brothers | 10,758.20 | 4,372.26 |
| | | $101,090.20 | $41,084.36 [9] |

## ORDER

This 29 day of December, 1999, in accordance with the accompanying Memorandum, it shall be, and hereby is, ORDERED as follows:

1. The Fresh Juice Company of New York, Inc. is allowed and limited to a general unsecured claim in the amount of $26,320.

2. Caito Brothers is allowed a Chapter 11 administrative claim in the amount of $10,758.20.

3. The secured claims of Navistar Financial Corp., National City Bank of Pennsylvania, Associates Commercial Corp., Dollar Bank Leasing, Iron and Glass Bank, First Western Bank, and General Electric Capital Corp. will be paid from the proceeds of the sale of their collateral in an amount of the lesser of their loan balance or the sale price of their collateral, less a proportionate share of sale expenses.

4. This is a final order subject to appeal.

5. Counsel for the Debtor is directed to make distribution in accordance with the schedule set forth in the accompanying memorandum after the time for appeal has expired.

6. The Clerk of the Bankruptcy Court is directed to serve a copy of the within Order and the accompanying Memorandum on all creditors and parties in interest.

---

9. This amount may be adjusted due to interest owed on secured claims and/or interest earned on funds presently held in escrow by Debtor's counsel.