In re BEAR KODIAK PRODUCE, INC., Debtor.

Callaway Produce Co., LLC. and Sunkist Growers, Inc., Plaintiffs,

v.

Bear Kodiak Produce, Inc., Bank of Tucson and Sharon Maxwell, Chapter 7 Trustee, Defendants.

Bankruptcy No. 02–00492–TUC–EWH. Adversary No. 02–0034.

United States Bankruptcy Court, D. Arizona.

Sept. 4, 2002.

---

Walter F. Wood, Tucson, AZ, for Debtor.

Susan G. Boswell, Paul Correa, Quarles & Brady Streich Lang, LLP, Tucson, AZ, Lewis P. Janowsky, Rynn & Janowsky, Newport Beach, CA, for Plaintiffs.

Scott D. Gibson, Kristen M. Green, Gibson, Nakamura & Decker, PLLC, Tucson, AZ, for Bank of Tucson.

## MEMORANDUM DECISION

EILEEN W. HOLLOWELL, Bankruptcy Judge.

### I. *INTRODUCTION*

In this case the court must determine if certain assets are part of the trust created to protect produce growers under the Perishable Agricultural Commodities Act of 1930, as amended in 1984, 7 U.S.C. §§ 499 *et seq.* (PACA). For the reasons set forth below, the court finds that some, but

not all, of the assets in question are part of a PACA trust.

## II. *FACTS*

Bear Kodiak (Debtor) opened for business as a produce broker in December of 1989. From the date it opened for business until August of 1998, the Debtor used a factoring company (Factor) to finance its business. Under that arrangement, all of the Debtor's accounts receivable were collected by Factor and the Factor paid the Debtor's accounts payable including all of its produce suppliers.

The principal of the Debtor, Mrs. Joan Baumann, and her late husband both worked for the Debtor. Mr. Baumann used his salary to pay for at least some insurance premiums on a life insurance policy (the Policy). After his death, Mrs. Baumann used the Policy proceeds to buy mutual funds (Mutual Funds).

After her husband's death in February of 1998, Mrs. Baumann took out a loan (Loan) with the Bank of Tucson (Bank) for $500,000.00. In connection with the Loan, the Debtor executed a commercial security agreement with the Bank and granted the Bank a security interest in substantially all of its assets including its accounts receivables, equipment, and certain vehicles. All of the pledged vehicles and equipment were acquired by the Debtor after it opened for business in December of 1989. Over $400,000.00 of the Loan proceeds were used to pay off the Debtor's outstanding obligations to the Factor, which included reimbursing the Factor for payment of all of the obligations to its produce suppliers, as of the Loan's July 7, 1998 closing date (Closing Date). In September of 1998, Mrs. Baumann, as the guarantor of the Loan, pledged the Mutual Funds to the Bank as additional collateral for the Loan.

On April 18, 2001, Callaway Produce Co. LLC shipped produce to the Debtor, and on its invoices noted its intention to preserve its rights under PACA. On November 6, 2001, the District Court for the District of Arizona entered a preliminary injunction against the Debtor prohibiting the dissipation of PACA trust assets including all assets of the Debtor and all assets of Mrs. Baumann. In January of 2002, the Debtor quit conducting any business. On February 7, 2002, the Debtor filed for relief under Chapter 7. On February 7, 2002, Mrs. Baumann also filed a Chapter 7 Petition.

## III. *STATEMENT OF JURISDICTION*

The court has jurisdiction in this case under § 5(c)(5) of PACA and 28 U.S.C. § 157. Venue is proper under 28 U.S.C. § 1408.

## IV. *PROCEDURAL HISTORY.*

On March 8, 2002, Callaway and Sunkist Growers[1] filed this adversary proceeding seeking, among other things, a declaration that its claims, as a purported beneficiary of the trust created under PACA, were superior to all claims of the Debtor, the Chapter 7 Trustee or the Bank to the Debtor's assets. On April 8, 2002, the Bank filed a Motion to Dismiss Callaway's request for Declaratory Relief on the grounds that certain vehicles and equipment owned by the Debtor (Equipment), and the Mutual Funds pledged to the Bank for the Loan by Mrs. Baumann were not part of the PACA trust.[2] Callaway opposed the Bank's Motion to Dismiss.

---

1. Sunkist subsequently withdrew all its PACA claims, therefore, the court will only refer to Callaway as the remaining plaintiff.

2. The Bank also moved for stay relief so that it could foreclose its security interest on the Equipment and Mutual Funds. The court has deferred ruling on the Bank's stay relief mo-

At the May 9, 2002 hearing held on the Motion to Dismiss the court determined that evidence would have to be taken on the question of whether the Equipment and Mutual Funds were part of the PACA trust. An evidentiary hearing was set for June 4, 2002, and the court ordered the parties to exchange witness and exhibits lists one week prior to June 4, 2002, and to file a pre-hearing statement by May 30, 2002.

At the June 4, 2002 evidentiary hearing, the Bank submitted a witness declaration from Mrs. Baumann and made her available for cross examination. On cross examination Mrs. Baumann testified that the Debtor acquired the Equipment during a period of time when all perishable agricultural commodities (PACA) suppliers were being timely paid by the Factor. She also testified that the Mutual Funds were acquired with proceeds from the Policy. She acknowledged that it was likely that at least some of the premiums for the Policy were paid from her husband's salary paid by the Debtor. Finally, she testified that finding business records of the Debtor and personal records of her late husband to determine if any of the premiums for the Policy were paid for by the Debtor or from her husband's salary would take months and might prove to be impossible.

Callaway did not call any witnesses. Callaway asserted that Mrs. Baumann's testimony was insufficient to meet the Bank's burden of proving that the Equipment and Mutual Funds were not part of the PACA trust because it was not the "best evidence". Callaway argued that only the records of the Debtor demonstrating that there were no outstanding invoices from any produce supplier on the dates that the Equipment and Mutual Funds were acquired and/or pledged to Bank would be sufficient to meet the Bank's burden of proof. Callaway asked for additional time to produce rebuttal evidence in the form of records from the "Blue Book Produce Reporter" to counter Mrs. Baumann's testimony that the Debtor timely paid its produce suppliers between December of 1989 and July of 1998. The court denied that request on the grounds of untimeliness. At the conclusion of the hearing, the court requested that the parties file supplemental briefs on (1) the scope and duration of the PACA trust and (2) whether the scope of the PACA trust extended to the assets of Mrs. Baumann. Both parties timely filed their briefs and the matter is now ready for decision.

## V. DISCUSSION

The issue is this case is whether the Equipment and Mutual Funds, which were acquired before Callaway delivered any produce to the Debtor, are part of a PACA trust created under 7 U.S.C. § 499e(c)(2).[3]

There is no Ninth Circuit authority directly on point. The Bank urges the court to adopt the holding of the Eighth Circuit in *Six L's Packing Co. v. Des Moines State Bank*, 967 F.2d 256, 259 (8th Cir.1992),

tion pending its determination of the Bank's Motion to Dismiss.

3. 7 U.S.C. § 499e(c)(2) provides in relevant part:

Perishable agricultural commodities received by a commission merchant, dealer, or broker, and all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers or agents.

which found that a PACA trust does not include property acquired before the PACA beneficiary first enters into a PACA qualified transaction with the produce broker. Because both the Equipment and Mutual Funds were acquired before Callaway first shipped goods to the Debtor, under the *Six L's* holding, the Bank would prevail on its Motion to Dismiss.

■ The Bank also asks the court to find that the Equipment is not part of the PACA trust because such assets do not fall within the definition of § 499e(c)(2) as inventory, receivables or proceeds derived from the sale of commodity products. The case cited by the Bank for support of its position, *United Fruit Produce Co., Inc.*, 242 B.R. 295 (Bankr.W.D.Pa.1999), does not, however, hold that assets such as the Equipment are, *per se*, exempt from a PACA trust. Rather, the holding in *United Fruit* was based upon the fact that the produce debtor used funds borrowed from its bank to acquire certain vehicles and equipment, and, therefore, the vehicles and equipment had not been acquired with PACA trust assets or proceeds derived from such assets. The court has found no case authority which supports the Bank's claims that certain types of assets are exempt from a PACA trust simply because of the character of the asset, i.e. vehicles, equipment, etc. The Bank cannot, therefore, prevail on its Motion to Dismiss based on such an argument.

Callaway urges the court to follow the Second Circuit's decision in *Tom Lange Co., Inc. v. Kornblum & Company, Inc.*, 81 F.3d 280 (2d Cir.1996), which held that a PACA trust is a single undifferentiated trust for the benefit of all sellers which continues in existence until all outstanding beneficiaries have been paid in full. Under *Kornblum*, a party opposing a claim

that a particular asset of a PACA buyer is part of a PACA trust, must demonstrate that: (1) no PACA trust existed when the asset in question was purchased; or (2) even though a PACA trust existed when the asset was purchased, the asset was not purchased with PACA trust assets; or (3) although a PACA trust existed when the asset was purchased, and the asset was purchased with trust assets, thereafter all produce sellers were paid in full, thereby terminating the trust. *Id.* at 287.

As previously stated, the Ninth Circuit has not directly addressed the question of what assets may be reached by a "late" supplier. However, the Court notes that in *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir.1997), the Ninth Circuit cites with approval the *Kornblum* holding, albeit for a different issue.[4] In addition, this Court agrees with the rationale evinced by the Second Circuit in *Kornblum* to the extant that it affects the disposition of Debtor's assets in the present case.

■ In passing PACA, and the 1984 Amendments, Congress intended to promulgate the full payment of produce suppliers by creating a non-segregated "floating" trust, consisting of all of the produce (and proceeds therefrom) shipped to a particular buyer, irrespective of the source. Congress intended to create a priority interest in produce suppliers, superior to that of banks or other secured lenders in the case of insolvency. *See* 7 U.S.C. § 499e(c)(1) (establishing that financing arrangements under which buyers give lenders a security interest in perishable agricultural commodities are contrary to the public interest, and indicating an intention to protect suppliers of such commodities); *see also Farm-Wey Produce, Inc. v.*

---

4. In *Sunkist,* the Ninth Circuit cites to *Kornblum* for the proposition that ordinary princi-

ples of trust law apply to trusts created under PACA. 104 F.3d at 282.

*Wayne L. Bowman Co., Inc.,* 973 F.Supp. 778, 783 (E.D.Tenn.1997) (citing H.R.Rpt. No. 98–543 (1983)).

■■■ According to § 499e(c)(2), a PACA trust is created when the first shipment of produce is received by a commissioned dealer, and any receivables or proceeds therefrom are held in trust for the benefit of *"all* unpaid suppliers." (emphasis added). The PACA trust continues to exist "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers or agents." *See* § 499e(c)(2). In enacting this legislation, Congress intended the trust to be nonsegregated and floating, thus, providing protection for late suppliers:

> The trust impressed by section 5(c)(2) is a nonsegregated "floating trust" made up of all a firm's commodity related liquid assets, under which there may be a commingling of trust assets. Under this provision there is no necessity to specifically identify all of the trust assets through each step of the asset accrual and disposal process. Since commingling is contemplated, all trust assets would be subject to the claims of unpaid seller-suppliers and agents to the extent of the amount owed them. Beneficiary claimants have the responsibility of establishing through their business records the details of the transaction on which payment is sought.

H.R.Rpt. 98–543 (1983); *see also* 7 C.F.R. § 46.46 (established by the Secretary of Agriculture to facilitate the PACA trust).[5]

In this regard, the holding in *Six L's* seems to conflict with the express language of § 499e(c)(2), in that it prevents a late supplier from sharing in PACA trust assets acquired prior to that supplier's first transaction with the buyer. Thus, to the extent that it is applicable, the Court adopts the holding in *Kornblum:* the assets of a PACA buyer are presumed to be part of a PACA trust unless it is shown that: (1) no PACA trust existed when the asset in question was purchased; or (2) the asset was not purchased with PACA trust assets; or (3) subsequent to purchasing the asset, the buyer paid in full all suppliers, thereby terminating the trust.

### 1. The Equipment

■■ As correctly noted by Callaway, the burden of proof is on the party opposing a claim that a PACA buyer's assets are subject to a PACA trust, to demonstrate which particular assets are not part of the trust. *Sanzone–Palmisano Company v. M. Seaman Enterprises, Inc.,* 986 F.2d 1010, 1014 (6th Cir.1993) (establishing that a PACA trust beneficiary need not establish that it was the source of a produce-related asset); *see also In re Churchfield,* 277 B.R. 769, 775 (Bankr.E.D.Cal.2002); *In re Richmond Produce Company, Inc.,* 112 B.R. 364, 378 (Bankr.N.D.Cal.1990).

■■■ In attempting to prove that the Equipment is not part of a PACA trust, the Bank alleges that: 1) the Equipment was purchased by Debtor at a time when all PACA suppliers were being paid,[6] and

---

**5.** *see also In re Atlantic Tropical Market Corp.,* 118 B.R. 139, 141 (Bankr.S.D.Fla.1990).

**6.** In fact, the evidence provided in support of this allegation was that all suppliers were being *timely* paid. It is unclear how this fact, assuming its truth were conclusively established, would bear on the court's determination of the disposition of the Equipment under

the *Kornblum* analysis. Pursuant to § 499e(c)(3), the Secretary of Agriculture established a 10–day payment period in 7 C.F.R. § 46.2 in accordance with the customary business practices of the produce industry. Thus, even if PACA suppliers were being *timely* paid at all times, i.e., no accounts were *delinquent,* there would still presumably be some outstanding invoices on a commissioned

584

2) upon receipt of the proceeds of the Loan in 1998, Debtor paid Factor in full, who in-turn paid all outstanding invoices from PACA suppliers, thus extinguishing any PACA trust then in existence. The Bank, however, introduced no documentary evidence in support of either allegation at the June 4, 2002 hearing. Rather, the Bank relied exclusively on the Declaration and testimony of Mrs. Baumann to establish both its assertions. However, although they are essentially un-controverted by Callaway, Mrs. Baumann's Declaration and testimony are insufficient to meet the Bank's burden under § 499e(c)(2). Even though Mrs. Baumann, as the principal of the Debtor, was competent to testify about the Debtor's business practices with respect to how the Debtor paid its produce suppliers and the circumstances surrounding the Loan, such testimony in the absence of any documentary support is simply inadequate to carry the Bank's burden. If the contrary were true, produce brokers could defeat a PACA trust by simply appearing in court and testifying that their assets were purchased with non-trust funds.[7] This could not have been the intention of Congress in establishing PACA. See e.g., *Atlantic*, 118 B.R. at 142 (holding that "the interest of maintaining the superior secured creditor status for the proper-

ly perfected unpaid supplier under PACA outweighs the two burdens placed upon the purchaser to track the status of the trust fund and to *provide evidence* of other origin of purchases of assets") (emphasis added). Therefore, the Bank has failed to meet its evidentiary burden under § 499e(c)(2) and consequently, the court finds that the Equipment is part of a PACA trust.

## 2. The Mutual Funds

As with the Equipment, Callaway asserts that the Mutual Funds are part of a PACA trust. According to Callaway, the Mutual Funds are traceable to monies paid by the Debtor during a time period when a PACA trust was presumably in place.[8] Callaway argues that because such monies were, at least in part, comprised of PACA trust assets, the Mutual Funds, as the proceeds of such monies, are subject to the trust.

There is, however, an important distinction between the Equipment and the Mutual Funds. At the time the Debtor filed for Chapter 7 protection, the Debtor retained both legal title to, and possession of, the Equipment. Conversely, at the time of filing, both title and possession of the Mutual Funds were vested in a third party, Mrs. Baumann. Nevertheless, despite

---

dealer's books. Under cases such as *Atlantic* and *Driscoll Potatoes, Inc. v. Robinson Potato Supply Co.*, 1 F.Supp.2d 1268, 1271 (D.Kan. 1998), the fact that no account is delinquent is immaterial; a PACA trust is presumed to exist unless the PACA buyer has no *outstanding* invoices on its books. (noting that a PACA trust is not extinguished unless there are no outstanding invoices). However, whether a PACA buyer must demonstrate that there were no outstanding invoices at the time a disputed asset was acquired, or rather, that there were no delinquent invoices when a disputed asset was acquired, is an issue the court does not reach due to the insufficiency of the Bank's evidence.

**7.** As noted in *Atlantic*, "the purchaser is in the best position of knowing the status of his or her debts" 118 B.R. at 141.

**8.** Callaway alleges that Debtor used monies from a general pool, which included the receipts and proceeds from prior sales of PACA trust assets, to pay the Baumanns' salaries, as well as other business expenses. In addition, Callaway alleges that the Baumanns used portions of their salaries to pay the premiums on Mr. Baumann's life insurance policy, the proceeds of which were used by Mrs. Baumann to purchase the Mutual Funds. Consequently, Callaway concludes that PACA trust assets can be traced into the Mutual Funds.

Mrs. Baumann's title and possession of the Mutual Funds, Callaway contends that it, and not Mrs. Baumann, is the equitable owner of the Funds.[9]

In this regard, Callaway asserts that the disposition of the Mutual Funds, like the Equipment, is controlled by the *Kornblum* analysis. According to Callaway, as a principal of the Debtor, Mrs. Baumann is indistinguishable from the Debtor—under Callaway's analysis, the treatment of Mrs. Baumann's assets, to the extent such assets are traceable to PACA trust assets, should correspond directly with the disposition of Debtor's assets. Callaway contends that under *Sanzone–Palmisano,* the Bank bears the burden of proving that the Mutual Funds are not subject to a PACA trust via one of the three *Kornblum* factors. Callaway further argues that because the Bank's evidence (Mrs. Baumann's Declaration and testimony) is insufficient to carry that burden, the Mutual Funds must be presumed to have been funded with PACA trust assets, and are therefore part of a PACA trust.

■ Whether the Bank should bear the burden under *Sanzone–Palmisano* of

proving that the Mutual Funds are not subject to a PACA trust is unclear.[10] However, such a determination is unnecessary because, even if it is found that the Baumanns received PACA trust assets as part of their salaries, those assets are not reachable by Callaway absent a showing of a breach of a PACA trust.

■ In *Boulder Fruit Exp. & Heger Organic Farm Sales v. Transportation Factoring, Inc.,* 251 F.3d 1268, 1272 (9th Cir.2001), the Ninth Circuit held that third-party transferees of PACA trusts assets are not guarantors of the PACA trust, and are liable only if they had some role in causing a breach of a trustee's fiduciary duty or dissipation of the trust.[11] The burden of establishing a breach of a PACA trustee's fiduciary duty is on the party so contending. *See Id.,* (observing that "the [plaintiff suppliers] never proved that the trust funds were misapplied in the first place"); *see also Overton Distributors, Inc. v. Heritage Bank,* 179 F.Supp.2d 818, 827 (M.D.Tenn.2002).

In the present case, Callaway alleges that PACA trust assets were transferred by the Debtor to the Baumanns as part of

9. The Court finds this to be a dubious argument. Assuming *arguendo* that the premiums on Mr. Baumann's life insurance policy were funded in part with PACA trust assets, and assuming that those assets could thus be traced into the Mutual Funds, at most, Callaway would be entitled to an equitable lien on the Funds only for the actual amounts of PACA trust assets expended on the premiums. Thus, Callaway would only be entitled to assert a small equitable lien against the Funds, rather than a lien against the entire value of the Funds. *See e.g., Farm-Wey,* 973 F.Supp. at 784 (stating that a third party should not be held liable for more than the actual amount of PACA trust assets disbursed).

10. In this case, Callaway alleges that PACA trust assets were transferred from the Debtor to the Baumanns as part of their regular paychecks (and subsequently used to pay pre-

miums on Mr. Baumann's life insurance policy). Unlike the Equipment, these assets are no longer in the Debtor's possession; nor were these assets ever received by the Bank. Thus, if tracing is indeed possible, it would seem that the Bank is in no better position to do so than Callaway. Consequently, the *Sanzone–Palmisano* Court's rationale for establishing such a burden is somewhat diminished. *See e.g., Mid–Valley Produce Corp. v. 4–XXX Produce Corp.,* 833 F.Supp. 193, 196 (E.D.N.Y.1993).

11. In *Boulder Fruit,* the Ninth Circuit held that a factor who had received PACA trust assets via a financing arrangement with a produce buyer, was not required to disgorge such assets absent a showing that the factor had received such assets in breach of trust. 251 F.3d at 1272.

their salaries in the ordinary course of Debtor's business. Thus, for Callaway to prevail under *Boulder Fruit*, the court must find that a PACA buyer's payment of salaries, in the ordinary course of business, constitutes a breach of a PACA trust.

Among the courts that have considered the issue, there is a divergence of opinion as to whether the payment of salaries and other ordinary business expenses constitutes a breach of trust. In *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346 (S.D.N.Y.1993), the district court held that a stockholder who was in a position to control PACA trust assets but failed to do so would be personally liable to suppliers for any unpaid debt. The court found that "a PACA trust imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier. This includes the use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities." *Id.* at 348. *See also Red's Market v. Cape Canaveral Cruise Line, Inc.*, 181 F.Supp.2d 1339, 1344 (M.D.Fla.2002). On the other hand, the Second Circuit has held that a PACA trustee may use trust assets to pay ordinary business expenses as long as it does not do so at the expense of its PACA beneficiaries, or in any way impair the ability of the beneficiaries to collect money owed in connection with produce sales. *See C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 488 (2nd Cir.2001) (citing Department of Agriculture Explanation of the Regulations Under PACA, 49 F.R. 45735, 45738 ("Trust assets are available for other uses by the buyer or receiver.")); *see also Boulder Fruit*, 251 F.3d at 1272 (holding that, in general, "a trustee can sell trust assets *unless* the sale breaches a trust ... [w]hether a transferee of trust assets is a bona fide purchaser becomes relevant only

as a defense *after it has been determined that a breach of trust has occurred*" (internal citations omitted) (emphasis added)).

In *Farm-Wey*, the Court analyzed the difficulty with finding that minimal salaries and expenses paid in the ordinary course of a produce buyer's business constitute a breach of a PACA trust:

As a practical matter, the corporate form would be meaningless for produce brokers. Shareholders, officers, directors, and even mere employees would risk personal liability for huge debts. Any financial reversal of a company could mean instant personal ruin for practically anyone associated with that corporation. Under those circumstances, few would wish to be associated with a broker that did business on anything other than a cash basis.

973 F.Supp. at 783. The court further observed that:

[A]ny payment of ordinary business expenses must necessarily be made from trust assets. The result is that any time a corporation pays any salary, rent, or anything other than its suppliers, it has breached the trust. If for some reason the corporation is subsequently unable to pay its suppliers, then the corporation's officers, directors, and shareholders are individually liable for the entire amount of the corporate debt. It is unlikely that any produce broker exists that pays no business expenses other than its suppliers, and thus every broker is breaching its trust duty by dissipating trust assets every time it pays salary, rent, or utility bills.

*Id.* at 784. Consequently, the District Court in *Farm-Wey* concluded that minimal salaries and expenses paid in the ordinary course of a PACA buyer's business do not constitute a breach of trust.

This court concurs with the rationale of the District Court in *Farm-Wey*. If the holdings in cases such as *Morris Okun* and *Red's Market* were correct, then any salary or bill paid by a PACA buyer during a prior period of solvency could hypothetically be subject to a PACA creditor's claim years later upon that buyer's subsequent insolvency. This is so because of the "floating" nature of the trust. Indeed, as in the present case, a supplier could attempt to assert an interest in salaries paid to a buyer's employees years before that supplier's first transaction with the buyer. It could not have been Congress' intent in enacting § 499e(c)(2) to allow a PACA supplier to reach into the pockets of innocent employees and third parties to satisfy a debt owed by a dealer. In addition, Congress did not intend to fashion a scheme which would impose strict secondary liability on a PACA buyer's officers and shareholders for authorizing ordinary course business payments to employees and other creditors—there must be some outward limit on a supplier's ability to collect its debts. *See* H.R.Rpt. 98–543 (Congress did not intend to "change the methods of doing business by either the seller or the buyer"). Consequently, the court finds that payments made in the ordinary course of a produce buyer's business, including minimal salaries and expenses, do not constitute a breach of a PACA trust.

In this case, Callaway has taken issue with the salaries paid to the Baumanns prior to 1998. However, Callaway has not introduced any evidence suggesting that the Baumanns' salaries were exorbitant, or paid outside the normal course of Debtor's business. Nor has any evidence been introduced that indicates that either Mr. or Mrs. Baumann knew of, or played any role in causing a supplier to go unpaid prior to Mr. Baumann's death in 1998. To the contrary, the only admissible evidence before the court (Mrs. Baumann's Declaration and testimony) indicates that at the time the salaries in question were paid, the Debtor was maintaining sufficient reserves to satisfy all of its outstanding debts and all suppliers were being timely paid.[12] Thus, Callaway has failed to demonstrate that the Baumanns received their salaries in breach of a PACA trust. Consequently, even assuming that the salaries included PACA trust assets, and such assets are traceable into the Mutual Funds, those assets are not reachable by Callaway.[13]

## VI. *CONCLUSION*

The court has determined that the Equipment is part of a PACA trust. In addition, the court finds that the determination of whether the Mutual Funds are subject to a PACA trust is unnecessary because even assuming they are, they are not reachable by Callaway via the PACA trust. The foregoing constitutes the court's findings of fact and conclusions of law as required under Bankruptcy Rules

---

**12.** Under Federal Rule of Evidence 402, all relevant evidence is admissible. Mrs. Baumann's Declaration and testimony were relevant to the Bank's claims that all suppliers were being timely paid before the Closing Date in 1998. Furthermore, Mrs. Baumann, as the principal of the Debtor, was competent to testify about the Debtor's business practices with respect to (1) how the Debtor paid its produce suppliers prior to taking out the Loan with the Bank, and (2) the circumstances surrounding the Loan. Thus, Mrs.

Baumann's Declaration and testimony are relevant and admissible as substantive evidence on these matters, even though the court has already determined that this evidence is insufficient to prove the Equipment was not acquired with PACA trust assets.

**13.** The court does not address the question of whether Callaway may reach the Mutual Funds under any other theory of liability.

of Procedure 9021. A separate order consistent with the terms of this Memorandum Decision will simultaneously be issued.