E. ARMATA, INC., Coosemans Specialties, Inc., D'Arrigo Bros. Co. of New York, Inc., Fierman Produce, Inc., Finest Fruits, Inc., Fruitco Corp., G & B Produce, Inc., Goodie Brand Packing Corp., Hunts Point Tomato Co., Inc., Jacobson Produce Inc., S. Katzman, Inc., King Sol Produce Corp., Kleiman & Hochberg, Inc., L & P Fruit Corp., Morris Okun, Inc., C.H. Robinson, Inc., D.M. Rothman Co., Inc., Rubin Bros. Produce Corp., Shapiro & Cohen, Inc., Paul Steinberg Associates, Inc., Martin Striks & Son, Inc., M. Trombetta & Sons, Inc., Ven–Co Produce, Inc., Wishnatzki & Nathel, Inc., Plaintiffs,

v.

PLATINUM FUNDING CORP. and Ron Andrews of L.I., Inc. d/b/a F. Wilson Smith, Defendants.

No. 95 Civ. 0517 (RPP).

United States District Court, S.D. New York.

May 30, 1995.

Leonard Kreinces, P.C. by Leonard Kreinces, Howard Rosenberg, Great Neck, NY, for plaintiff.

Mark C.H. Mandell, Annadale, NJ, for plaintiff Morris Okun, Inc.

Solomon and Weinberg by Deborah A. Silodor, New York City, for defendant Platinum Funding Corp.

Ullman, Furhman, Platt & Koy, Morristown, NJ, for defendant Ron Andrews of L.I., Inc.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Twenty-four plaintiffs bring this action as unpaid sellers of perishable agricultural commodities under the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a–s ("PACA"). This Court has jurisdiction pursuant to 7 U.S.C. § 499e(c)(4).

Defendants are Ron Andrews of L.I., Inc. d/b/a/ F. Wilson Smith (collectively, "Andrews"), a distributor of foods and produce located at 22 Hudson Drive, Stony Point, New York, and Platinum Funding Corp., a servicing agent, and Platinum Funding Series I.L.P., a limited partnership which provided the funds for Platinum's operations (collectively, "Platinum").

A non-jury trial was conducted on March 2, 7 and 14, 1995. This opinion and order constitutes the Court's Findings of Fact and Conclusions of Law.

Plaintiffs are sellers of perishable agricultural commodities who claim not to have received payments of $80,466.60 billed for perishable agricultural products sold and delivered to Andrews, a dealer in perishable agricultural commodities, and licensed under PACA on June 5, 1993 (Pl.Ex. 26). Pursuant to 7 U.S.C. § 499e(c)(2), Andrews held all of its inventory as well as accounts receivable and proceeds of sales of perishable agricultural commodities in a statutory trust for the benefit of its unpaid PACA suppliers.

On May 25, 1994 Andrews closed its business (Tr. at 76 [Ross]),[1] and on May 25 or 27, 1994 it stopped receiving mail. Thereafter, all plaintiffs timely preserved their rights under Section 499e(c)(3) by filing the requisite notices with the U.S. Department of Agriculture ("U.S.D.A.") and mailing to Andrews PACA notices covering $80,466.60 in PACA goods and sold and delivered to Andrews (Pl. Exs. 1–26). It is these claims for which plaintiffs seek recovery from defendants.

### Background

After receiving its PACA license, Andrews entered into a Factoring Agreement with Platinum on June 23, 1993 (Def. Ex. 11; Pl. Ex. 27) in which it agreed, for a period of nine months, that it would sell, and in which Platinum agreed it would purchase, Andrews' accounts receivable. Pursuant to the Factoring Agreement, Andrews agreed to tender Platinum all of sellers' invoices to be rendered to sellers' customers, which Platinum would then deliver to the customers, together with notices of Andrews' irrevocable assignment of payment to Platinum.[2] Andrews also delivered to Platinum a Security Agreement, a Performance Guaranty by its officers, and Uniform Commercial Code financing statements for filing in the applicable jurisdictions. Andrews was to receive the aggregate amounts collected by Platinum less aggregate advance amounts Andrews received and less Platinum's fees and expenses. The rate of advance payments and fees were set forth in separate Account Agreements actually denoted as Purchase and Sale Agreements (Def. Ex. 13), to which were attached the invoices assigned.

Platinum thereafter filed U.C.C.–1 financing statements and copies of the Security Agreement with Andrews in Rockland County, New York, and with the Secretary of State of New York on June 14, 1993 (Def.

---

1. Citations in this Opinion and Order to the Trial Transcript will be in the form "Tr. at ____."

2. Platinum had a right to reject invoices, but in actuality Platinum rejected no invoices.

Exs. 4, 5 and 6). In addition, Andrews' customers were notified that their accounts had been assigned to Platinum and that all Andrews' invoices were to be paid to Platinum (Def. Ex. 1). Thereafter, between June 23, 1993 and December 31, 1993, Platinum regularly advanced to Andrews 60% of the face amount of batches of invoices assigned by Andrews and paid an additional amount upon collection of the entire batch of invoices assigned after subtraction of Platinum's fees and expenses which varied according to the length of time required to collect the batch of invoices.

On January 1, 1994, three months prior to the termination date of the Factoring Agreement, Platinum and Andrews entered into a superseding factoring agreement to cover the next fifteen months and the parties agreed upon an advance rate of 65% (Pl.Ex. 11). Tr. at 90–93 (Ross).

Andrews' President Elliot Ross testified that the superseding factoring agreement and higher advance rate were entered into because he had told officers of Platinum that he needed larger advances in order to pay his bills and because January and February would be slow months since country clubs and certain other customers would be closed those months. Tr. at 93–94 (Ross). Ross testified that he again told Platinum executives Sig Laster and Al Levy in February that Andrews had cash flow problems. Ross also discussed with Laster that Andrews had been posted by a credit rating agency, and Laster told Ross "I saw your name appeared in the book again." Tr. at 102. The "book" referred to PMS, the Food Industry's Clearinghouse Weekly Bulletin to which Platinum subscribed and which on February 21, 1994 listed Andrews as having had accounts turned over for collection by two creditors. Pl.Ex. 32. At or around this time, Ross again told Platinum executives he was having trouble paying his bills. Tr. at 99–100 (Ross).

During this period Platinum furnished Andrews with what it denominated "over advances," i.e., advances of funds collected but not yet due to be paid under the terms of the parties' Agreements. Def. Ex. 14. Total "over advances" to Andrews by Platinum totalled $943,527.51, $751,860.85 of which occurred between January and May 1994.

On March 7, 1994 and March 25, 1994, at Platinum's request, National Code Corporation caused corporate good standing and U.C.C. lien searches to be made against Andrews. (Def. Exs. 9 and 10).

Platinum offered no evidence that it contacted Andrews' suppliers after Mr. Ross advised Mr. Laster and Mr. Levy that Andrews was having trouble paying its bills or after it received notice of Andrews being posted by the PMS Clearinghouse. Platinum purchased accounts receivable from Andrews in 1994 in the following amounts: January—$296,841; February—$406,515; March—$465,541; April—$269,463; May—$182,907. (Def. Ex. 2).

On June 2, 1994, Platinum received actual notice, by letter of Leonard Kreinces, Esq., dated June 2, 1994, that Andrews had not paid its produce suppliers along with notice of PACA Trust claims against Andrews' assets. (Pl.Ex. 28). By letter to Kreinces dated July 8, 1994, Platinum stated it was still due approximately $47,000 out of $140,000 total receivables outstanding from Andrews customers. (Pl.Ex. 29). On September 29, 1994, Platinum notified Kreinces that it was still due $18,732.41 out of total Andrews receivables outstanding of $91,988.64. (Pl.Ex. 30). Platinum's collection report of collections posted between June 2, 1994 and July 27, 1994 (Pl.Ex. 31) for Andrews' customers shows a total of $169,956.44. Platinum has made no payments to Andrews since June 2, 1994. Nor has Platinum made any payments to plaintiffs.

■ The advances at 60 and 65 percent of face value under the Factoring Agreement and subsequent Purchase and Sale Agreements, whether denominated as sales of the account receivables, or loans by a secured lender as plaintiff Morris Okun, Inc. ("Okun") contends, do not constitute transfers for value. Platinum, under this discount arrangement, cannot be considered a bona fide purchaser. To qualify as a bona fide purchaser, Platinum "must show that any trust property [it] received was transferred 'for value' and 'without notice of the breach

of trust.'" *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1314 (11th Cir. 1992). Under the facts, the PACA trustee, Andrews, was not transferring the accounts for value but at a discount to raise funds and expand the business of the trustee rather than to maintain assets that could satisfy the fund's obligations. *Post & Taback, Inc. v. Merrill Lynch Business Financial Services Inc.*, 859 F.Supp. 757, 758–59 (S.D.N.Y.1994); *A & J Produce Corp. v. CIT Group/Factoring, Inc.*, 829 F.Supp. 651, 656 (S.D.N.Y. 1993); Restatement (Second) of Trusts § 304 (1959).

■ More importantly, Platinum's claim that it was a bona fide purchaser fails because it had constructive knowledge of the trust and constructive knowledge of the breach of trust. The trust in this case, a PACA trust, is created by federal statute. Accordingly, the lender had constructive notice of the existence of the trust by virtue of its knowledge of the nature of the borrower's business. *See In re Gotham Provision Co., Inc.*, 669 F.2d 1000, 1011 (5th Cir.) (Packers and Stockyard Act provides constructive knowledge of trust), *cert. denied*, 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982); *C.H. Robinson*, 952 F.2d at 1315 (constructive notice from PACA Statute). Invoices purchased by Platinum revealed that the underlying transactions involved the food industry and perishable agricultural commodities (*see* Def. Ex. 13), and Andrews' President stated that he informed Platinum regularly that the majority of its business involved perishable agricultural commodities (Tr. at 148–49 [Ross]). Having knowledge of the trust's existence, Platinum, being advised that Andrews was having difficulty paying its suppliers and having notice that two creditors had turned bills owing from Andrews over for collection, had a duty to do more than check as to the filing of any judgments or liens against Andrews. That information put Platinum on notice that a breach of trust could have occurred. It had rights under the Factoring Agreement to conduct an audit of Andrews' books and records, including review of bank accounts and cancelled checks. Pl. Exs. 10 and 11. Conducting such an audit in April 1994 would have revealed at least one bounced check and PACA filings in April 1994, as well as outstanding amounts due for suppliers' deliveries in February 1994. (Pl. Exs. 12 and 24). Instead of conducting such an audit, Platinum advanced Andrews $269,463 in April and $182,907 in May 1994 (Def. Ex. 2). As the Eleventh Circuit noted:

> It seems more accurate to say that a person has notice of a breach of trust when he has actual knowledge of the breach or when he has knowledge of such facts that he should ascertain by inquiry whether the trustee is committing a breach of trust.

*C.H. Robinson Co.*, 952 F.2d at 1315 n. 4 (citation omitted). Under these facts, Platinum should have known that the PACA trust was in breach. Therefore, Platinum is liable to plaintiffs for $80,466.60 held by Andrews in the PACA trust.

## I. *ATTORNEYS FEES*

■ Attorneys fees are not available under the PACA statute where a contractual basis for the fees is lacking. *See In re W.L. Bradley Co., Inc.*, 78 B.R. 92 (Bankr. E.D.Penn.1987) (no entitlement to attorneys fees under section 499e(c)(2)); *but cf. In re Monterey House, Inc.*, 71 B.R. 244 (Bankr. S.D.Tex.1986) (using Packers and Stockyards Act as model, award of attorneys fees was proper under PACA). Since Congress provided in PACA for the award of attorneys fees under section 499g(c) following an appeal pursuant to section 499b, "the absence of a similar provision [for attorneys fees] in section 499e(c)(2) is further evidence that Congress did not intend to award attorney's fees to trust beneficiaries under PACA." *W.L. Bradley*, 78 B.R. at 95–96 (declining in a footnote to follow *Monterey House*).

■ Attorneys fees are properly granted in such circumstances only if an independent basis exists for the award. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257–59, 95 S.Ct. 1612, 1621–22, 44 L.Ed.2d 141 (1975) (exceptions to "American Rule" that prevailing party is not entitled to attorneys fees include (1) statutory basis, (2) enforceable contract, (3) willful violation of court order, (4) bad faith action, and (5) litigation creating common fund for the benefit of others).

Plaintiff Morris Okun asserts that terms of the sales between it and Andrews provide for attorneys fees in this action. *See* Pl. Exs. 15, P–O–17A and P–O–19. Although Platinum was not a party to these agreements, Okun argues that the amount due for attorneys fees is to be disgorged by Platinum in connection with the constructive trust. *See* Letter of Mark C.H. Mandell to the Court dated March 27, 1995 at 1–2. As discussed above, PACA would not authorize the award of attorneys fees, and under *Alyeska* there is no basis for such an award in the absence of a contractual provision. However, a clause in Okun's invoices requires Andrews to pay reasonable attorneys fees "[i]f legal action is taken to collect past due amount[s]" not yet received by the unpaid seller, Okun; Pl. Exs. 15, P–O–17A and P–O–19; and under PACA "any receivables[,] or proceeds from the sale of such commodities or products, shall be held ... in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers or agents." 7 U.S.C. § 499e(c)(2). Since Okun has taken legal action to collect past due amounts, its attorneys fees constitute "sums owing in connection with such transactions" and are payable from the PACA trust amounts. Okun's claim for reasonable attorneys fees is granted.

## II. *PREJUDGMENT INTEREST UNDER PACA*

PACA does not provide for the award of prejudgment interest, and under federal law such an award rests on the Court's discretion. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6–7, 92 L.Ed. 3 (1947) (failure to mention interest in a federal statute permits the courts to fashion such rules in light of congressional purposes). Courts have awarded prejudgment interest under PACA based on congressional intent to protect agricultural suppliers. *See W.L. Bradley*, 78 B.R. at 93–94 (prejudgment interest from date of default fulfills legislative purpose of PACA by discouraging slow payment); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346, 351 (S.D.N.Y.1993) (Sand, J.) (prejudgment interest awarded on overdue accounts based on congressional intent in PACA); *Tray–Wrap, Inc. v. Meyer*, 1994 WL 710804 (S.D.N.Y. December 20, 1994) (Cote, J.) (PACA prejudgment interest awarded from date of unreasonable rejection). Prejudgment interest on the amounts due plaintiffs and held in constructive trust by Platinum is awarded from the date of default by Andrews on each claim.

### *CONCLUSION*

Plaintiffs have established that a PACA trust existed in the amount of $80,466.60, and that Platinum had constructive knowledge of the PACA Trust and of such facts that it should have ascertained by inquiry and audit whether Andrews was committing a breach of trust. Accordingly, Platinum is liable to plaintiffs for $80,466.60 plus prejudgment interest from the date of default of payment on each claim. Okun's request for reasonable attorneys fees is granted, but requests for attorneys fees by the other plaintiffs are denied.

IT IS SO ORDERED.