**OVERTON DISTRIBUTORS, INC., Plaintiff,**

v.

**HERITAGE BANK, Defendant.**

No. 3:00–0284.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 7, 2002.

Richard L. Colbert and J. Frank Rudy, Jr., Colbert & Winstead, Nashville, TN, for Heritage Bank.

Stephen P. McCarron, McCarron & Associates, Washington, D.C., Richard A. Guy, Jr., Waller, Lansden, Dortch & Davis, Nashville, TN, for Overton Distributers.

## MEMORANDUM AND ORDER OF THE COURT

JOHN T. NIXON, Senior District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a civil action in which Plaintiff, Overton Distributors, Inc ("Overton") seeks damages from Defendant Heritage Bank ("Heritage") under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e *et seq.* This Court granted partial summary judgment on August 28, 2001, leaving a number of issues for trial (Doc. No. 59). After a non-jury trial on September 11 and 12, 2001, the Court makes the following findings of fact and conclusions of law. For the reasons stated below, judgment will be entered in favor of Overton and against Heritage.

### Findings of Fact

1. Plaintiff Overton, a Tennessee corporation with its principal office in Nash-ville, is a buyer and seller of wholesale quantities of perishable agricultural commodities ("produce") in interstate commerce. (Doc. Nos. 48, ¶ 2; 52, ¶ 1).

2. Between 1993 and 2000, Overton regularly sold produce to Quality Foods of Tennessee, Inc.("Quality"), a company run by Charles Hall and Charlain Jarman–Hall. Mr. Hall served as general manager and Ms. Jarman–Hall, as bookkeeper and office manager of Quality. (Tr. p. 137, 158; Jarman–Hall Depo., p. 12).

3. Defendant Heritage[1] is a commercial bank located in Clarksville, TN, which provided banking services to Quality at all times relevant to this litigation. (Doc. No. 52, ¶¶ 2, 12).

4. Both Overton and Quality were, at all relevant times, PACA licensees. (Doc. No. 52, ¶¶ 1, 4). In accordance with PACA, as amended, Overton included language on its invoices indicating its intent to retain a trust claim over commodities sold to Quality. (Doc. No. 52, ¶ 7). The payment terms included on the invoices varied over the course of Overton's relationship with Quality.

5. In 1998, the payment terms reflected on the invoices were changed by Overton employee Cathy Grossman, Director of Business Development. After the 1998 change, the payment terms listed on the invoices were 10 days E.O.M. (End of Month). Ms. Grossman altered internal documents to change the payment terms of the Quality account because Quality's payments were often late. (Tr., pp. 79–81).

6. On November 23, 1993, Overton wrote a letter to Quality, indicating Overton's intention to preserve their rights under the Trust Funds Provision of PACA and noting that their terms with Quality

---

1. Heritage was purchased by Old National Bank of Indiana in the fall of 2000, and Old National Bank of Indiana is now the real party in interest. For the sake of convenience, this Court will refer to the bank as "Heritage."

were different from the "net ten day" limit outlined in PACA. The letter indicated that Overton's credit terms "will be a fifteen-day accrual cycle and payment is due within ten days after the completion of each cycle." (Def.Exh.6). The letter was signed and returned to Overton by Charlain Jarman–Hall on January 19, 1994. (Id.).

7. On January 11, 1995, Overton prepared and filed a document with the United States Department of Agriculture seeking PACA protection for a number of Quality's outstanding invoices. (Tr. p. 130; Def. Exh. 5). The filing listed payment terms of fifteen days. (Id.).

8. Quality foods consistently paid Overton on an irregular and tardy basis, often taking up to forty or sixty days to pay an invoice. (Tr. pp. 167–171; Pl. Exh. 13). Although the terms of payment may have been changed on the invoices, Quality Foods continued to pay on their own terms. (Tr. p. 168). Charles Hall testified that the terms of payment he abided by were thirty days from the date of invoice, although Quality did not abide by those terms. (Tr. p. 168). Overton would regularly call Quality about its slow payments on the account, but it never required Quality to strictly abide by any specific terms of payment. (Tr. pp. 92, 166). Ms. Grossman testified that Overton tolerated Quality's late payments because Overton thought that Quality would eventually pay. (Tr. p. 78).

9. Through most of Quality's existence as a company, their checking account was overdrawn, and Quality had difficulty paying its bills. (Doc. No. 52, ¶ 15; Tr. p. 164). Heritage, through its agents, had knowledge that Quality was in overdraft and monitored Quality's checking account statements. (Id.). Loan Review Officer Glen Rainey was aware of numerous "insufficient funds" charges incurred by Quality. (Rainey Test., Tr. p. 33–34). In fact, Heritage internally categorized Quality as a "substandard" loan customer because of its lack of profitability. (Id., at p. 57).

10. Heritage extended several loans to Quality between 1992 and 1999, secured by all of Quality's assets. (Doc. Nos. 48 ¶ 3; 52 ¶ 12). Until February of 2000, Quality had an excellent loan payment history. (Tr. p. 165).

11. Quality also received a $300,000 loan from the Small Business Administration, ("SBA") in 1994.

12. On August 8, 1996, Quality and Heritage Bank entered into a Business Manager Agreement. ("BMA"). The BMA allowed Quality to obtain advances from Heritage against the face value of various accounts receivable that it presented to Heritage. (Doc. No. 52, ¶¶ 20, 21). Heritage became the absolute owner of Quality's interest in its outstanding receivables, and account proceeds were owned and controlled by Heritage Bank. (Pl. Exh.1, ¶ 2.1).

13. The BMA required Quality to represent and warrant that its receivables and collateral were free and clear of all security interests, liens, and claims of third parties, and that its inventory was not subject to any security interest, lien or encumbrance. (Id., ¶ 4.1).

14. Quality submitted approximately 90% of its invoices to Heritage pursuant to the BMA arrangement. (Tr, pp. 139–41).

15. The BMA provided a service to Quality, whereby Heritage would administer and manage Quality's accounts, essentially acting as a bookkeeper, in return for a service charge. (Tr. pp. 30, 46).

16. Heritage initially charged a fee of 3.6% for every 21–day period of time, which was later negotiated down to 2.5%. Heritage held another 10% of the amount

in an interest-bearing reserve fund. The 10% reserve was paid to Quality upon a customer's payment of an outstanding invoice. (Pl.Exh.1, ¶¶ 1.10, 1.11, 2.5).

17. Under the BMA recourse obligation Quality remained liable for all advances it received from Heritage in the event the proceeds from the accounts receivable did not cover the funds advanced. (Id., ¶¶ 1.9, 2.1, 3.1). Charles Hall and Charlain Jarman–Hall also made personal guarantees. (Id., HB 001668–71). Heritage could debit any of Quality's accounts with Heritage, including the 10% "reserve account," to pay any deficiency. (Id., ¶ 3.2).

18. Heritage generated monthly statements on the BMA, entitled "Merchant Profit Statement", which denoted an "Average Outstanding Balance for All Accounting Periods." These reports also calculated an annualized percentage return on the BMA. (Pl.Exh.7). The annualized return was consistently more than 20%. Id.

19. The BMA arrangement involved the purchase of Quality's accounts. (Tr., p. 140, 150). Glenn Rainey testified that Quality's accounts, once purchased by Heritage, were considered assets of the Bank. (Tr., p. 8). However, the Bank's loan advances were characterized as "Loan Advance" Commitments. (Pl.Exh.6). Additionally, the document initially memorializing the BMA is titled a "Loan Memorandum." (Pl.Exh.2).

20. In the October of 1999, Mr. Hall secured a $50,000 loan from Heritage in order to pay some of Quality's unpaid bills. (Schaaf Depo., pp. 28–32). At the time of the loan, Quality had an outstanding SBA loan of $300,000 and a $50,000 line of credit with Heritage. (Id.; Charles Hall Depo., pp. 150–51). Prior to making the loan, Mr. Paul Schaaf, Heritage Loan Officer, warned Mr. Hall that no additional credit would be extended to Quality. (Schaaf Depo., p. 32).

21. Most of the loan was used to pay Overton. (Tr. p. 163).

22. However, within three days of receiving the loan, Quality's operating account was once again in overdraft. (Id.). In early January, 2000, upon learning that Mr. Hall had written $25,000 $30,000 worth of checks, Heritage determined that they would be unable to provide overdraft protection for Mr. Hall's checks. (Schaaf Depo., p. 33). On January 13, 2001, Charles Hall met with Overton President Jeff Beasley and Chief Financial Officer Jeff Merkle at the Overton Warehouse in Nashville and informed them that a check in the amount of $28,557.35 would be returned by Heritage for lack of funds. (Charles Hall Depo, p. 101; Beasley Depo., pp. 59–61). Mr. Beasley informed Mr. Hall the Overton would not extend any additional credit to Quality Foods. (Beasley Depo., p. 66).

23. Denied credit by both his bank and his major supplier, Mr. Hall closed Quality within a week. (Charles Hall Depo, p. 101).

24. In February 2000, Quality defaulted on its loan obligations to Heritage and the Bank foreclosed on Quality's remaining assets, yielding less than $6,500 to Heritage. (Doc., No. 48, ¶¶ 6, 7). Subsequently, Charles Hall and Charlaine Jarman–Hall filed petitions under Chapter 7 of the Bankruptcy Code in July of 2000, and have since received a discharge from the Bankruptcy Court. (Doc. No. 48, ¶ 9).

25. On March 30, 2000 Overton filed its Complaint in this Court against Heritage Bank, alleging that Heritage had retained PACA trust assets in the form of Quality's accounts receivable and the proceeds of those accounts. (Doc. No. 1). Overton seeks PACA trust assets in the sum of

$220,529.06, representing produce sold to Quality, and fees collected pursuant to the BMA.

### Conclusions of Law

The Court has subject matter jurisdiction over the parties in this case, pursuant to 28 U.S.C. § 1331, because the PACA statute is a federal statute. 7 U.S.C. § 499a *et. seq.* PACA was initially enacted in 1930 to promote fair business practices in the marketing of produce. PACA was intended to regulate the shipping and handling of fruit and vegetables to prevent "fraudulent rejections" by purchasers of produce, especially during the economic downturn that befell the nation in 1929. *See George Steinberg & Son, Inc.v. Butz,* 491 F.2d 988, 990 (2nd Cir.1974). *See generally* Sandra M. Ferrera, *Perishable Agricultural Commodities Act Affecting Lender's Secured Priority Interests,* 7 U. Miami Bus. L.Rev. 353 (1999).

The statute was amended in 1984 to create a statutory trust for the benefit of produce suppliers. The purpose of the 1984 amendments was to ease the burden on interstate commerce in produce "caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment ... encumber or give lenders a security interest in such commodities, or on inventories of food ... and any receivables or proceeds from the sale of such commodities or products ..." 7 U.S.C. § 499e (c)(1). The legislative history indicates that Congress was particularly concerned with instances where brokers or dealers failed to pay for produce or were slow in making a payment. H.R.Rep. No. 543., 2d Sess. 4, *reprinted in* 1984 U.S.C.C.A.N. 405, 406. The notes accompanying the PACA amendment indicated that a trust would address the problem of unsecured sellers not receiving priority in payment. *Id.* at 407.

Therefore PACA, as amended, created a floating, non-segregated statutory trust, extending to commodities and products derived from commodities, receivables, or proceeds from the sale of the commodities or products. *Consumers Produce Co. v. Volante Wholesale Prod., Inc.,* 16 F.3d 1374, 1378 (3rd Cir.1994). The Committee on Agriculture noted that security interest holders, such as money lenders, are well-positioned to determine that a commission merchant, broker or dealer is in financial difficulty and to act upon that information to protect their security interests. H.R.Rep. No. 543, 98th Cong., 2d Sess. 4 (1983) *reprinted in* 1983 U.S.C.C.A.N. 410–11.

### A. Preservation of rights under PACA.

To preserve its rights under the PACA trust, a qualified beneficiary must either send notice to the buyer within 30 days of a payment default (the "notice" method) or include statutory language on its invoices. The latter method, herein the "invoice" method, was enacted pursuant to a 1995 amendment to PACA. H.R.Rep. No. 207, 104th Cong., 1st Sess.1995, 1995 U.S.C.C.A.N. 453. The notes accompanying the 1995 amendment indicate that the additional method of providing notice was intended to "provide both a convenience and a cost savings to the unpaid supplier, seller or agent." *Id.*

In order for a party to assert rights as a PACA beneficiary it must have preserved its rights under the trust. This Court previously held, in its Summary Judgment Order of August 28, 2001, that Overton preserved its rights as a PACA trust beneficiary by using the "invoice method." Overton printed the statutory language on its invoices and also included payment terms on the invoices. Overton printed the following statutory language on its invoices to Quality:

The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a claim over these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

The payment terms on the invoices did not match the payment terms memorized in a form letter sent by Overton to Quality in late 1993. The form letter was signed by Charlain Jarman–Hall in January of 1994, and indicates that at least someone at Overton intended that Overton's credit terms would be a fifteen-day accrual cycles and payment would be due within ten days after completion of each cycle. Plaintiff contends that this letter did not constitute an agreement between Overton and Quality because Quality did not believe that it was entering into an agreement to alter the payment terms. Heritage Bank seeks to uphold the terms of the 1994 letter, claiming that Quality would be required to collect payment no later than twenty-five days after any shipment was accepted.

The Court need not resolve the dispute over the 1994 letter. The terms of payment are ambiguous, and whether or not there was an agreement that was not incorporated into the invoices, the PACA statutory language expressly indicates that the statutory default of ten days shall apply in the absence of an agreement otherwise. The Secretary of Agriculture has specifically determined that a default payment term of ten days after acceptance of commodities applies, unless the parties expressly state otherwise in writing. 7 C.F.R. § 46.2(aa)(5).

Here, there was no clear agreement. The fact that the payment terms on the invoices did not memorialize the terms of payment in the agreement does not mean that Overton did not preserve its rights under the trust. The fact that the parties purported to agree to a payment time period different from that established by the statute does not mean that a failure to properly memorialize these terms on the invoices constitutes a failure to properly preserve rights as a beneficiary under the PACA trust.

Admittedly, Overton failed to include the payment terms on its post–1998 invoices. Courts have held that a failure to include payment terms on invoices divests the seller of trust benefits. *In re San Joaquin Food Service, Inc.*, 958 F.2d 938 (9th Cir. 1992). Courts have also rejected a "good faith" or "substantial compliance" exception to PACA's strict requirements. *See Id.* However, another Circuit Court has more recently recognized that a Court should "liberally interpret PACA to further its remedial purposes of reducing the burden on commerce and protecting unpaid sellers." *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 204–205 (3d Cir.1998). Thus, the Court held that "the [PACA] writing requirement ... does not disqualify an unpaid seller from receiving trust benefits." *Id.* at 204. The producer in *Idahoan Fresh* "satisfied the notice requirement by including the requisite language on the face of their invoices and neither party agreeing to a payment period over thirty days." *Id.* at 204. Similarly, in *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777 (8th Cir.1991), the Eight Circuit Court of Appeals found that "as PACA imposes a trust immediately upon transfer, the notice provision serves merely to notify the Secretary [of Agriculture] and the debtor of the claimed trust. Thus, as long as the Secretary and the debtor may derive the necessary information from the notice, it should suffice to preserve the trust." *Id.,* at 783. Although the *Hull*

case concerns the "notice" method, rather than the "invoice" method, the reasoning expressed by *Hull* is even more apt in the present situation. Indeed, if the purpose of 7 U.S.C § 499e(c)(3) and (4) is to give notice to the buyer that the seller intended to preserve its PACA rights, the Court should be concerned with whether or not Overton's actions succeeded in putting Quality on notice. Here, Overton's actions put Quality, and hence Heritage, on notice.

■ This Court declines to find that the PACA legislation is "draconian" legislation that must be strictly construed against sellers. *C.f. In re: H.R. Hindle & Co., Inc.*, 149 B.R. 775 (Bankr.E.D.Pa.1993)(terming the PACA legislation "draconian"); *In re: D.K.M.B., Inc.*, 95 B.R. 774, 779 (Bkrtcy.D.Colo. 1989). The Court is aware that PACA is special interest legislation, but a compromise of the rights of specially-protected creditors is not to be taken lightly. Congress expressly chose to favor the sellers of perishable agricultural commodities over other creditors, and reading the PACA statute and regulations in a strict way would only serve to subvert the intention of Congress. Where Congress has expressly stated its purpose in passing legislation, the Court must assume that special interests within Congress have had an opportunity to express their opinions. James Madison recognized long ago in The Federalist Papers that the passions of one faction will be checked by both distrust and the passions of other factions. The Federalist No. 10 (James Madison).

■ The purpose of the PACA provisions is forward looking: it is meant to allow sellers to preserve their rights under the trust by giving notice to the buyer. This Court will not read PACA in blind hindsight, oblivious to PACA's purpose, and thereby reward clever, after-the-fact lawyering at the expense of a statute that addresses the inherently fleeting nature of produce. Hence, the PACA statute must be liberally construed in light of its purpose.

Here, Overton satisfied the notice requirement by including the requisite language on the face of their invoices. Because there was no clear agreement otherwise, the default ten day period is the applicable payment period. Hence, Quality and Heritage were put on notice by the language included on the invoices. Therefore, the Court finds that Overton has preserved its rights under the trust, and thus may assert its rights as a PACA trust beneficiary.

## B. Receipt of Trust Assets and Breach of Trust.

Although Overton preserved its rights as a PACA beneficiary, it still must show that Heritage received trust assets, and that this constituted a breach of trust, allowing Overton to recover under the PACA provisions.

■ General trust law is applicable to the specific PACA trust provisions. *See, e.g., Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir. 1998). Accordingly, a breach of trust is defined as "a violation by the trustee of any duty which as a trustee he owes to the beneficiary." Restatement (Second) of Trusts § 201 (1959). This definition does not conflict with PACA's definition of a trustee's duties. PACA requires trustees to "maintain the trust assets in a manner that such assets are freely available to satisfy outstanding obligations to produce sellers. Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and a violation of [PACA]." 7 C.F.R. § 46.46(d)(1). The regulations further define "dissipation" as "any act or failure to

act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." *Id.* § 46.46(a)(2).

■ Before the Court determines whether there was a breach of trust, it must ascertain whether or not Heritage received trust assets. The Court finds that Heritage did receive trust assets. The parties agree that Heritage purchased Quality's accounts receivable, that approximately 90% of Quality's business was the sale of produce covered by PACA, and that Quality was a PACA licensee. *See In re Kornblum & Co., Inc.*, 81 F.3d 280 (2d Cir.1996). Heritage did not present any proof to show that the assets it received from Quality in payment of the "service charge" or through liquidation after default are not the proceeds of PACA trust assets. *See Sanzone–Palmisano Co., v. M. Seaman Enter.*, 986 F.2d 1010 (6th Cir.1993). Thus, the Court concludes that Heritage did receive PACA trust assets. *Id.* at 1014 (recognizing the difficulties facing a PACA debtor in attempting to show that they did not possess trust assets, and noting that this is what "Congress intended."). Hence, the $220,529.06 unpaid produce debt constitutes trust assets received by Heritage. The Court must next determine whether Heritage received the trust assets in breach of trust.

■ Whether or not there was a breach of trust depends on this Court's characterization of the BMA. If, as Plaintiff urges, the BMA is viewed as a loan or a credit arrangement, then Heritage breached the trust. On the other hand, if the BMA is viewed as a purchase of Quality's accounts receivable, combined with services that the bank provided in exchange for 2.5%–3% of the accounts, then Heritage did not breach the trust.

Whether the BMA constituted a breach of trust and whether Heritage gave value for the trust assets acquired can only be determined by the actual nature of the agreement, regardless of the terminology used. *Endico Potatoes, Inc. v. CIT Group/ Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir.1995). The federal courts that have considered similar financial agreements have come to different conclusions. Most recently, the Ninth Circuit Court of Appeal held that factoring agreements, whereby accounts receivable are sold at a discount for cash, are not per se breaches of the PACA trust. *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268, 1271–72 (9th Cir.2001). The *Boulder Fruit* Court found that where, as in that case, the factoring agreement is "commercially reasonable," it is not a breach of the PACA trust. *Id.* Whether or not a factoring agreement is commercially reasonable is dependent upon its terms. *Id.* Thus, in *Boulder Fruit,* the Court held that a factoring agreement involving a PACA trustee selling his accounts receivable for 80% of face value was not a breach of trust. *Id.* By contrast, in *E. Armata, Inc. v. Platinum Funding Corp.*, 887 F.Supp. 590, 593 (S.D.N.Y.1995) the district court determined that a lender's advances of only 60 or 65% of face value of a PACA licensee's accounts receivable under a factoring agreement did not constitute transfers of the accounts receivable for value. Although it did not explicitly state that the transfer was a breach of trust, the *Armata* court found that the PACA trustee had transferred its accounts for a discount to raise funds and expand its business instead of maintaining the trust assets to satisfy its obligations as a trustee. *See id.*

Heritage Bank's BMA with Quality constituted a breach of trust. The evidence presented at trial elucidates the BMA, and

makes clear that the BMA, while certainly a service rendered by the bank to Quality, did not involve Heritage Bank's purchase of receivables. To the contrary, the facts discussed above show that the BMA was more analogous to a loan or a line of credit than a purchase. (Findings of Fact, ¶ 17–19). The exhibits submitted at trial show that Heritage considered the BMA to be both a service and line of credit. While Heritage supplied envelopes, postage and other bookeeping functions, they also paid off the line of credit with proceeds of receivables, earning the bank a per annum interest greater than the 3% service charge.

The facts show that under the BMA Heritage initially paid 87% of face value and placed 10% into an interest-bearing reserve account in Quality's name. Heritage retained approximately 3% as a service charge. Under the BMA the bank loaned money to Quality based on the accounts receivables generated on a particular day. The account, a trust asset, would then be transferred to the bank. Heritage would then receive payment from customers and credit that payment against the loan balance. When the entire loan balance was paid off, Quality's obligation for that amount would be satisfied. Heritage had a security interest, the right to debit any other account of Quality, and personal guarantees of the Halls to secure the outstanding loan. Thus, although Quality

would be "off the hook" for the accounts receivables that were paid off, it continued to be indebted to Heritage for the cash advances until those advances were ultimately paid off. Since Quality retained the risk of nonpayment, Heritage did not actually purchase the accounts receivables. Thus, because Heritage held only a security interest in Quality's accounts receivables, and did not purchase those accounts for value, its interest was subject to the rights of the PACA trust beneficiaries—Overton. Thus, in making the BMA credit arrangement with Heritage Bank, Quality encumbered PACA trust proceeds, the very arrangement that Congress sought to redress by passing the PACA statute. See 7 U.S.C. § 499e(c)(1). As discussed above, PACA creates a trust in favor of the seller, Overton, which is superior to the interest of Quality's secured lender, Heritage. *See Sanzone–Palmisano Co. v. M. Seaman Enter., Inc.*, 986 F.2d 1010, 1012 (6th Cir. 1993). Hence, Heritage Bank's arrangement with Quality constituted a breach of the PACA trust, and Heritage received trust assets in breach of trust.[2]

Thus, because the Court finds that the BMA did not amount to a "purchase", it is not necessary to determine whether the BMA was a commercially reasonable purchase, as per the *Boulder Fruit* analysis.[3] Therefore, the Court will next consider whether, even if Overton properly preserved its PACA rights and Heritage re-

---

**2.** This is not unjust. Congress considered the equities associated with granting the sellers of produce a special trust, superior to all secured creditors. Although this is most certainly "special interest legislation", it was passed by the legislature of the United States, and this Court must enforce the PACA statute. Hence, assuming there was a breach of the PACA trust and no defenses apply, Heritage must bear the loss in this case. While the PACA statute is highly specialized, the legislative history shows that the drafters of this legislation contemplated that the PACA re-

quirements "would be known to and considered by prospective lenders in extending credit" and thus would "not be a burden to the lending institutions." H.R.Rep. No. 543, 98th Cong., 2nd Sess. 4 (1983), *reprinted in* 1984 U.S.C.C.A.N 407.

**3.** While Heritage asserts that the 3% service charge, amounting to 36% per annum, was commercially reasonable, Overton claims the charge was actually 43.5% per annum, and was not commercially reasonable.

ceived trust assets in breach of trust, Overton's claims must still fail because Heritage was a bona fide purchaser of accounts receivable.

## C. Bona Fide Purchaser Defense.

■ A lender who has received trust funds from a produce buyer may assert the bona fide purchaser defense [4], although PACA does not impose explicit obligations upon, or provide explicit remedies against, third-party transferees who receive trust property in breach of trust. *See generally* Michelle G. Oleksa, Comment, Protecting the Power of the PACA Trust: Contemplating the Effects of the Bona Fide Purchaser Defense, 173 San Joaquin Agricultural Law Review (1998).

■ General trust principles allow a "bona fide purchaser" to retain trust property even if the property was transferred in breach of trust. *See, e.g., Sunkist Growers*, 104 F.3d at 282; *Endico Potatoes*, 67 F.3d at 1067–68; Restatement (Second) of Trusts § 284(1). The bona fide purchaser defense is defined by the Restatement (Second) of Trusts as follows:

> If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.

Therefore, if there has been a breach of the PACA trust, a third-party transferee, such as Heritage, may escape liability if it: (i) gave value for the trust property, (ii) had no actual or constructive notice of the breach of trust, and (iii) did not knowingly take part in an illegal transaction. The burden of proof is on the transferee to establish its protected status as a bona fide purchaser. *Gargiulo, NT v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir.1997). *See also C.H. Robinson Co.*, 952 F.2d at 1313, 1316. *See, e.g., Oscar Gruss & Son v. First State Bank*, 582 F.2d 424, 432 (7th Cir.1978) (holding that party claiming to be a bona fide purchaser under Article 8 of U.C.C. bears burden of proof); *Natural Resources, Inc. v. Wineberg*, 349 F.2d 685, 688 n. 8 (9th Cir.1965) (stating that defendant's claim that he is an innocent purchaser is an affirmative defense and she bears the burden of proof).

### 1. Transfer for Value

■ The general rule for determining whether a transfer is for value, is that where "the trustee transfers trust property in consideration of the extinguishment of a pre-existing debt or other obligation, the transfer is not for value." Restatement (Second) of Trusts, *supra*, § 304(1). The "money-transfer" exception to the general rule that allows a transferee to receive trust property if the property is "a negotiable instrument or money." *Id.* § 304(2)(a); *see Gargiulo*, 131 F.3d at 1000; *Consumers Produce Co.*, 16 F.3d at 1381; *C.H. Robinson Co.*, 952 F.2d at 1315; *Chiquita Brands, Inc. v. MicBruce*,

---

**4.** At least one district court in this circuit has held that the bona fide purchaser defense is "inapplicable in cases involving PACA trust because [it] would render the trust ineffective against most secured creditors." *Lyng v. Frydman*, No. C86–1210Y, 1988 WL 168632, *5 (N.D.Ohio 1988). However, the large majority of courts have considered the bona fide purchaser defense in PACA cases, and this

court will consider the bona fide purchaser defense. *C.f.* Sandra M. Ferrera, *Perishable Agricultural Commodities Act Affecting Lender's Secured Priority Interests*, 7 U. Miami Bus. L.Rev. 353 (1999)(arguing that courts should not have departed from the *Frydman* analysis, and should abandon the use of the bona fide purchaser defense).

*Inc.,* 800 F.Supp. 1521 (N.D.Oh.1992). The rationale for this exception is simply that many ordinary financial transactions would be impossibly cumbersome if every recipient of money from a trustee bore the burden of verifying the payor's title to the money. *See Albee Tomato,* 155 F.3d at 615; *C.H. Robinson,* 952 F.2d at 1314. Lenders who receive PACA trusts assets through the ordinary course of business-including loan payments-may be BFPs, but those that receive trust assets through the enforcement of a security agreement are not bona fide purchasers because such transfers are not for value. *See Gargiulo,* 131 F.3d at 1000; *Consumers Produce Co.,* 16 F.3d at 1380 n. 3, 1382.

The case of *Endico Potatoes* is instructive. In that case, Merberg, a licensed produce dealer, received loan and advances from CIT for amounts up to 80% of Merberg's outstanding accounts receivable. *See id.* at 1065, 1068. In return Merberg agreed "to transfer, assign and grant to [CIT] a continuing lien on and security interest in all of Merberg's right, title and interest in and to all of [Merberg's]" current and future accounts receivable and related assets. *See id.* at 1068. Under the agreement Merberg's customers submitted payment to Merberg, which were then endorsed and deposited for the benefit of CIT. *See id.* After Merberg went bankrupt, CIT continued to receive proceeds of Merberg's accounts receivable. CIT did not dispute that PACA trust beneficiaries had a right to the trust assets superior to creditors who hold a security interest in those assets, but it contended that it had a superior claim to the assets because pursuant to the Financing Agreement it had paid value for its interest in the accounts receivable. *See id.* In determining that CIT did not have a superior claim, the Second Circuit Court of Appeals reasoned that:

[w]here the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Endico,* 67 F.3d at 1069. To determine whether under the financing agreement CIT had a mere security interest in the accounts receivable or had purchased them, the *Endico* court looked to a number of factors, including the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt. *Endico,* 67 F.3d at 1068–69 (citations omitted). The court determined that the language of CIT's financing agreement showed that CIT only held a security interest in the accounts receivable. *See id.* The court considered it relevant that the agreement stated that the loans were made upon the security of the accounts receivable, and that Merberg's assignment of accounts receivable had no effect on the outstanding balance of Merberg's indebtedness. *See id.* Merberg's loan was only reduced when CIT received payment, whether the payment arose from accounts receivable or from any other source. *See id.* Moreover, CIT

could demand payment directly from Merberg for the entire outstanding loan, and if Merberg paid all of its outstanding obligations, CIT would no longer hold an interest in Merberg's outstanding accounts receivable. *See id.*

As in *Endico Potatoes,* this case involves a security interest, rather than a sale of accounts receivable. Hence, there is no value. Clearly, the determination of whether Heritage gave value for the trust assets is closely linked to the issue of breach of trust discussed above. The Court has already determined that the BMA was not a purchase, but more akin to a line of credit. Here, Heritage used the accounts receivable to reduce a prior debt. Of course, Heritage charged a fee for services it performed as part of the BMA, but that 2.5% fee does not determine the nature of the BMA. In fact, at least 97% of the BMA was not associated with a fee for services rendered. Hence, the Court finds no merit in Heritage's claim that the service fee renders the BMA an instrument for value. Thus, because the Bank assumed no risk of loss under the BMA, and since the BMA amounted to a security device whereby Heritage secured its advances to Quality with the receipt of PACA trust assets, there was no value.

## 2. Notice

The Court must next consider whether Heritage had notice of the breach of trust. Notice of the existence of a trust is not equivalent to having notice of a breach of that trust. *Battle v. Fresh Preps Distribution, Inc.,* 873 F.Supp. 1062 (E.D.Mich.1995). A person has notice of a breach of a trust only if he knew or should have known of the breach. *C.H. Robinson Co.,* 952 F.2d at 1314 (citing Restatement (Second) of Trusts § 297). A party should have known of the breach when a reasonable inquiry would have revealed the breach of the trust. *Gargiulo,* 131 F.3d at 1000. Under the Restatement (Second) of Trusts:

[a] third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.

§ 297 comment a.

Thus, a duty of inquiry arises when a person knows facts which under the circumstances suggest (1) that the person is dealing with a trustee and (2) that the trustee may be committing a breach of trust. If a duty of inquiry exists, and such inquiry would have disclosed the breach of trust, a person "should have known" of the breach of trust. *Consumers Produce Co.,* 16 F.3d at 1383. "The existence and the extent of a duty of inquiry depend on the character of the transaction and the character of the trust property." *Id.* "In the PACA context, a duty of inquiry arises when a third-party transferee has knowledge that a produce purchaser/trustee is not paying produce suppliers or is in financial difficulty." *Battle,* 873 F.Supp. at 1067. A third party's knowledge that a transfer involves a PACA trustee and the transfer of trust assets is insufficient alone to create a duty of inquiry. *Chiquita Brands,* 800 F.Supp. at 1526.

Heritage Bank acknowledges that despite its actual ignorance, it is deemed to have had knowledge of the PACA trust because the trust was created by a federal statute. (Doc. No. 50 at 15.) *See Consumers Produce Co.,* 16 F.3d at

1382. Indeed, it is undisputed that a bank has constructive notice of the existence of a PACA trust because a federal statute created the trust. *See Gargiulo*, 131 F.3d at 1000; *C.H. Robinson Co.*, 952 F.2d at 1315; *E. Armata, Inc.*, 887 F.Supp. at 594. However, the PACA statute does not create strict liability for breach of a PACA trust. *Consumers Produce*, 16 F.3d at 1381, as discussed above.

 Although Heritage claims that it was not aware of PACA until January of 2000, the Court finds that they had constructive notice of both the PACA trust and its breach long before January of 2000. First, Heritage knew that Quality was in the produce business and was aware of their financial difficulty. As early as 1993, Mr. Schaaf was aware that Mr. Hall was having trouble paying his bills and suppliers, and that he understood Mr. Hall's regular overdrafts to be an indication that he was having financial difficulty. (Schaaf Depo. pp. 13–14). Second, a reasonably diligent inquiry would have revealed to Mr. Schaff and Heritage Bank that their arrangement with Quality amounted to a breach of the PACA trust.

 While it may be the true that Heritage was not *actually* aware of PACA until early 2000, let alone a breach of the PACA trust, that does not relieve Heritage of their burden. As discussed above, the legislative history of the 1983/4 amendments to the PACA Act indicate that Congress believed that the PACA trust requirements "will be known to and considered by prospective lenders in extending credit." H.R.Rep. No. 543., 2d Sess. 4, *reprinted in* 1984 U.S.C.C.A.N. 405, 406. Receipt of an official PACA notice is not the only way that a lender can learn of a PACA trustee's financial difficulty or failure to pay its suppliers. Such a conclusion would be inconsistent with the definition of inquiry notice given in the Restatement (Second) of Trusts § 297(a). That is, a duty of inquiry arises when a person knows facts, which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust. *Consumers Produce*, 16 F.3d at 1383. Banks that conduct business with PACA trustees should not ignore other accurate indicia of financial distress, while awaiting the arrival of PACA notices. Any information that a reasonably prudent lender would consider sufficient to commence an inquiry is sufficient to trigger a duty of inquiry under PACA. *See Albee Tomato*, 155 F.3d at 617.

 Heritage contends that even if they conducted a reasonable inquiry upon learning of Quality's tenuous financial position, they would not have learned of the breach of the PACA trust. However, Courts apply a stringent test to determine whether a lender has notice of a PACA breach. In *Albee Tomato*, the Court held that

> "[t]he lender must make the kind of inquiry as to debts owed by the trustee to PACA beneficiaries that a reasonably prudent lender would make as to debts owed by a similar borrower to a prior creditor who had rights superior to those sought by the lender. We adopt this test because PACA in fact bestows just such superior rights on the beneficiary suppliers and the test has the benefit of being one familiar to the lenders."

155 F.3d at 617. The test, therefore, is not whether the lender knew about a specific PACA trust violation, but, on the other hand, whether the lender had a duty of inquiry to investigate the borrower's finances further, and whether that investigation would have indicated that there was a breach of trust. *See Consumers Produce*, 16 F.3d at 1381–1386.

Heritage had a duty to investigate Quality's finances further. Heritage was aware that Quality was in financial trouble. Not only was Quality's checking account often overdrawn (Findings of Fact, ¶ 9), but Heritage established the BMA to allow Quality to meet its financial obligations. (*Id.*, ¶¶ 12–19). A reasonably prudent lender would have continued to pursue the paper trail, and would have determined that Quality was, for example, paying Overton at least 60 days past invoice in 1999. (Pl.Exh.13). However, the Bank continued to obtain accounts receivable, pursuant to the BMA. Heritage Bank may not stand behind a "blissful ignorance" defense to vigorously pursuing and investigating the existence of a breach of trust. Banks are in the business of risk assessment, and not only may Heritage Bank not stand behind its own ignorance, it may not use the ignorance of Overton as a defense to their own duty of inquiry. Overton may not have been aware that there was a breach of PACA trust in October of 1999, (Beasley Test., Trans. p. 198). However, Heritage Bank's own duty of inquiry is dependent upon their own obligations as a lender, not on Overton's expertise.[5] Thus, a reasonably prudent lender would have concluded that the bank's actions amounted to a depletion of the PACA trust, resulting in insufficient trust assets available to pay Overton.

This case differs from *Battle* in several significant ways. In *Battle*, the court found that the creditor (NBD) initiated its inquiry into the produce purchaser's finances prior to the time that the duty of inquiry actually arose. In addition, the court found that NBD requested documents and records from the produce pur-chaser, Fresh Preps, who were unwilling to cooperate. Thus, the court reasoned that the creditor did not have notice of the PACA trust, and was a bona fide purchaser. By comparison, in this case there is no evidence that Heritage Bank diligently pursued its duty of inquiry at any time, and there is also no evidence in the record showing that Quality was ever unwilling to cooperate with any inquiry into its finances. To the contrary, Heritage had a duty of inquiry before Quality's demise, and they failed to undertake even a minimal inquiry into Quality's situation and the breach of a PACA trust.

Heritage claims that, even assuming it had a duty of inquiry, its inquiry would have lead it to find that there was no PACA trust because the applicable payment terms extended beyond thirty days. In addition, Heritage claims that the actual payment terms differed from the payment terms reflected on the invoices, thereby foreclosing a preservation of the PACA trust under the invoice method. Thus, Heritage claims that a reasonable investigation would have disclosed that there could be no PACA trust, let alone a breach of that trust.

The Court finds that a reasonably prudent lender's investigation would have resulted in constructive knowledge that there was a PACA trust. Even if the Court did not find that there was a PACA trust, a reasonably prudent businessman, undertaking an analysis of the Overton invoices, would have noticed the explicit PACA language. That alone should have lead Heritage to ·conclude that they were dealing with trust assets. It is only now, in hindsight, that attorneys claim (unsuc-

---

**5.** While Overton is in the produce business, their PACA knowledge was apparently limited until recently. However, PACA was established to protect the seller of produce, and this Court will not rely on Overton's knowl-edge in order to determine whether Heritage satisfied its own duty. A reasonably diligent inquiry would have continued past a simple conversation with Overton, and would have, ultimately, revealed a breach of trust.

cessfully) that the payment terms rendered that Overton—Quality arrangement non-PACA compliant. However, as discussed above, this Court will not replace the creative legal theories of counsel for the reasonable conclusions of a reasonably prudent lender in Heritage Bank's position. Thus, there was a PACA trust, and a reasonably prudent lender would have discovered as much. Additionally, Heritage was in receipt of trust assets, and in breach of the PACA trust. Hence, for these reasons and because the Court concludes above that the payment terms on the Overton invoices were sufficient to preserve the PACA trust, Heritage Bank's arguments are inapplicable.[6] Since Heritage did not give value and had notice of the breach of a PACA trust, Heritage is not entitled to a bona fide purchaser defense.

### D. Attorneys Fees

■ Absent a contractual basis, courts have held that attorneys' fees are not available under the PACA Act. *E. Armata, Inc. v. Platinum Funding Corp.*, 887 F.Supp. 590, 594 (S.D.N.Y.1995). Although some courts have granted attorneys' fees in cases alleging a breach of PACA trust, those courts have acknowledged that PACA does not expressly provide for attorneys' fees. *Golman–Hayden Co., Inc. v. Fresh Source Produce, Inc.*, 27 F.Supp.2d 723 (N.D.Tex.1998). The Supreme Court has recognized the general rule that attorneys' fees are granted only if an independent basis exists for the award, such as a statute. The Court, however, noted several exceptions allowing the award of attorneys' fees where: (1) there was a willful violation of a court order; (2) a losing party acted in bad faith; or (3) a litigant created a common fund for the benefit of others. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Although some courts have held that the PACA common fund may be used to pay attorneys' fees, *see e.g., In re Milton Poulos, Inc.*, 947 F.2d 1351 (9th Cir.1991), this Court declines to follow this reasoning. *See C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483 (2d Cir.2001)(declining to pay attorney fees out of a common fund); *Golman–Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348 (5th Cir.2000) (discussing common fund issue, but withholding judgment). PACA was passed to allow produce sellers to recover funds held in trust, and it would violate the purpose of the PACA statute to allow fees to be paid out of that fund. Additionally, the PACA statute does not authorize the payment of separate attorneys' fees. Accordingly, attorneys' fees will not be granted to Overton.[7]

### E. Prejudgment Interest

■ PACA does not explicitly provide for an award of prejudgement interest. The Supreme Court has held that failure to mention interest in a federal statute allows a court to permit prejudgment interest when it furthers the congressional

---

6. While this finding may be harsh to the lender, the PACA statute contemplates such a result. Lenders must be aware of applicable federal statutes that constrict their lending practices, are in the best position to undertake a reasonably diligent inquiry to determine whether an arrangement violates• a PACA trust.

7. Overton argues that it will not receive the full benefit of the trust because it must now pay a portion of those proceeds to its attorneys. This Court is not convinced by this reasoning. First, prevailing parties frequently pay their attorneys out of their winnings, and Congress did not intend for PACA to be any different. Second, the benefit Overton retains from this judgment is not simply monetary. This finding is just and proper.

purpose in passing the legislation. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 92 L.Ed. 3 (1947). In light of PACA's purpose of protecting produce suppliers, courts have awarded prejudgment interest in the PACA context. *E. Armata*, 887 F.Supp. at 595. This Court is persuaded by the reasoning of the court in *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346, 351 (S.D.N.Y.1993).

> Failure to make such an award may create a disincentive to prompt payment to suppliers and encourage collection litigation while financially strapped purchasers fend off creditors, contrary to the congressional intent evidenced in PACA

Thus, the Court will award prejudgement interest running from the date of default. *See generally, In re W.L. Bradley Co.*, 78 B.R. 92 (Bkrtcy.E.D.Pa.1987). The appropriate rate in this case is set forth in 28 U.S.C. § 1961 (2001)(as amended on December 21, 2000). This interest is awarded from the date that Heritage initially collected the receivables in breach of the PACA trust.

### *ORDER*

For the reasons discussed above, Overton has established that a PACA trust, totaling $220,529.06, was breached by the actions of Heritage Bank. Accordingly, Heritage is hereby ORDERED to pay to Overton a sum of $220,529.06, plus prejudgment interest from the date of breach, pursuant to the interest rate promulgated in 28 U.S.C. § 1961. The parties shall submit a joint order indicating the total judgment amount, including prejudgment interest, within five (5) business days of the entry of this order.

IT IS SO ORDERED.